Michael Anthony Blanks appeals from his conviction of manslaughter in the circuit court of Lauderdale County and sentence to twenty years imprisonment. Because of the erroneous admission of prejudicial evidence, we reverse.
 FACTS
Michael Anthony Blanks was born April 4, 1968, out of wedlock. He was reared by his mother, who later married Willie Burns and had three more children, several years younger than Michael. On Saturday, October 25, 1986, they lived in St. Andrew Apartment No. 35 at 2801 St. Andrew Street in Meridian. Michael was in the eleventh grade. He was blind in the left eye as a result of a B-B gun shot wound when he was six years of age.
On that day James Earl Patton, Jr., nicknamed "Pap," lived with his parents Lillie Mae and James Earl Patton, Sr., and a younger brother and sister at Apartment 17, 2812 St. Andrew Street. Pap was born March 15, 1969, and was also in the eleventh grade. Michael and Pap had been schoolmates and friends since the third grade. James Lemon, who was in the tenth grade and lived at 2017 St. Andrew, was also a friend of both these boys.
Caroline Blanks left around 1:30 that afternoon to visit an invalid aunt in Columbus, taking the three younger children with her. She returned just after dark the next day. Michael was left at the apartment alone. Mrs. Blanks owned a .25 caliber automatic pistol, which she usually carried with her back and forth to work, but left her purse in the apartment that day. She ordinarily tried to keep it hidden in the closet at home, and when she carried it in her car, she put it in a door pocket. Around 6:30 that evening Michael asked Pap's parents if he could come over. This was the last time Mr. and Mrs. Patton saw their son alive. That evening Michael came by the Patton house around 8:30-9:00 o'clock and asked Mr. Patton had he seen Pap, and Mr. Patton told him that Pap was supposed to be at his house. Mr. and Mrs. Patton worried that night over Pap's not returning home, and the next morning Mrs. Patton went to Michael's house and asked him if he had seen Pap, and he told her that he had not. That afternoon Michael also told Mr. Patton that he knew nothing about Pap's whereabouts. On Monday, October 27, Michael came by the Patton's home, again inquiring about Pap. On two or three subsequent occasions Michael telephoned the Patton residence inquiring about Pap.
On Sunday, November 2, the body of Pap was found near Sowashee Creek, a hollow approximately 450 feet from Michael's apartment. This area was deserted and covered with weeds and bushes.
Both Lemon and Michael were questioned by the Meridian police on November 2, but not particularly as suspects. Michael, however, was given the Miranda warning, and gave a detailed written statement of Saturday, October 25, but denied knowing anything about Pap's death.
Although the corpse was decomposing and maggot-ridden, Dr. James Neill, a pathologist, determined that Pap had been killed by one shot in the head, the bullet entering the area of the left eye.
R.D. Harris was principal of the high school attended by Pap and Michael. On November 5 there was a short memorial to Pap over the public address system, and a request for silent prayer. A few minutes later a student from Michael's class reported to Mr. Harris that Michael was "very upset" and that he needed to talk to him. Mr. Harris sent Grace Otis, Michael's counselor, to get him and talk to him. A few moments later Mr. Harris passed her office, and asked Michael if he wanted to say anything, but he did not reply. Mr. Harris then took Michael to his office, and told him if he wanted to cry, it was all right to do so. Mr. Harris then put his hand on *Page 32 
Michael's shoulder. He testified in court as follows:
 Q. What happened next?
 A. I put my hand on his shoulder and he started to talk and he said, "Well, it was an accident." I said, "What was an accident? Is there something you need to tell me?" You know. And, he said that they had — they had the gun that night — that Michael had seen the gun and that he picked it up and was curious about it and he asked him how the gun worked.
 Q. Did he say where he saw the gun?
 A. On a bookstand I think he said, in the front room where they were. That it was over behind the book and he took it out and they looked at it and James asked him how did the gun work and he proceeded to show him and that's when the gun went off.
 Q. Did he state how the gun went off?
 A. No. I think as I remember he said he pulled the trigger.
 Q. Now, when you say he —
 A. Michael.
 Q. Did you ask Michael how he got the body out of the house?
 A. I did. I asked him and he said he got a Winn-Dixie grocery cart.
 Q. Did you ask him about what time this was?
 A. No, sir. At that point I asked him if he had told his mother and he said no. And, so I proceeded to call his mother and told her we had a little emergency or crisis and she asked what it was and I told her, "I prefer you to come out and let's talk."
 Q. Did you call the police?
 A. After his mother got there and we talked to her and I told her we had to call the police. At that time I called Chief Marlow and asked specifically to speak to him. He was out and Assistant Chief Miller then put me in touch with the detective that was assigned to the case.
 Q. Did you have any more conversation with Michael Blanks pertaining to what happened that night?
 A. No, sir.
(Vol. I, pp. 109-110)
When Michael's mother arrived at the school, they embraced, and Michael started crying. He told her that it was an accident. Mrs. Burns (Blanks) then telephoned an attorney.
When Michael was arrested, he refused to give any statement to the police, no doubt on the advice of his lawyer, and telling them that he was "taking the Fifth."
On November 20, 1986, Michael was indicted by the Lauderdale County grand jury for the murder of James Patton, Jr., "done in acts eminently dangerous to James Patton, Jr., and others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of James Patton, Jr.," in violation of Miss. Code Ann. § 97-3-19(1)(b). This statute reads:
 § 97-3-19. Homicide; murder defined; . . .
 (1) The killing a human being without the authority of law by any means or in any manner shall be murder in the following cases:
 * * * * * *
 (b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;
Michael testified at trial that when Pap was in his apartment the night of October 25, that he saw the pistol and asked to be shown how it worked. He testified:
 A. . . . and I started to show him how it works and I got the gun out and took it off safety and then I got the cartridge and put it in the gun and pulled the lever back on it and then I took the cartridge back out and I was putting the gun back on safety and it went off.
 Q. Michael, have you ever shot that gun before?
 A. No, sir.
 Q. What instructions, if any, did your mother give you about the gun? *Page 33 
 A. She didn't tell me anything as to how it worked or nothing.
 Q. Were you supposed to have the gun?
 A. No, sir.
(Vol. II, p. 137)
He testified he tried to revive Pap without success, even giving him mouth-to-mouth resuscitation. In a short while he went to Lemon's house, and went with Lemon to a store. Michael returned to his apartment. He then went and got a shopping cart, returned to the apartment, and loaded the body onto the cart. He then took the body in the cart between the apartments over near the creek, where he dumped it, and also left the cart. This was around 10:30 p.m. on Saturday, October 25. He testified the reason he lied about the killing was that he was scared and confused.
The jury was instructed on murder under Miss. Code Ann. §97-3-19(1)(b), as well as manslaughter by culpable negligence.
The jury returned a verdict of guilty of manslaughter, and Michael was sentenced to twenty years.
On appeal he assigns numerous errors.
 LAW
We first address the sufficiency of the evidence under assignment number five. In doing so, we start with the well-settled proposition that the unexplained killing of one person by another is presumed to be malicious, and therefore murder. See, Nicolaou v. State, 534 So.2d 168 (Miss. 1988);Whittington v. State, 523 So.2d 966 (Miss. 1988); Fairchild v.State, 459 So.2d 793 (Miss. 1984); Hendrieth v. State,230 So.2d 217 (Miss. 1970); Shields v. State, 244 Miss. 543,144 So.2d 786 (1962); Hughes v. State, 207 Miss. 594, 42 So.2d 805
(1949); Wright v. State, 162 Miss. 494, 139 So. 869 (1932);Hawthorne v. State, 58 Miss. 778 (1881).
This presumption has no application where there are eyewitnesses to the slaying other than the accused, who relate the facts and circumstances surrounding the killing. See, Tignerv. State, 478 So.2d 293 (Miss. 1985); Reed v. State, 229 Miss. 440, 91 So.2d 269 (1957).
Where the only eyewitness to the slaying is the accused, another rule of law becomes applicable, the familiar Weathersby Rule, Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933). If the defendant's version of the killing is reasonable, it must, as a matter of law, be accepted as true, unless "substantially contradicted in material particulars by a credible witness, . . . or by the physical facts or by facts of common knowledge." Also,Harveston v. State, 493 So.2d 365 (Miss. 1986). A defendant who met the Weathersby Rule would be entitled to a directed verdict of acquittal.
As stated in Weathersby, and many of our subsequent decisions, this rule has no application where the defendant's version is patently unreasonable, or contradicted by physical facts. Where the defendant is the only eyewitness to a slaying, his version must be reasonable and credible before he is entitled to an acquittal under the rule.
And, there is still another circumstance which still precludes the application of the Weathersby rule, and that is where the accused, following the slaying, gives conflicting versions of how the killing took place, or initially denies the act. See, Smithv. State, 530 So.2d 155 (Miss. 1988); Burge v. State,472 So.2d 392 (Miss. 1985); May v. State, 460 So.2d 778 (Miss. 1984).
As we explained in Harveston v. State, supra, the Weathersby rule is simply a statement of a well-recognized principle of law that where the defendant's, and sole eyewitness's, version of a slaying is uncontradicted, reasonable and credible, it must be believed. And, if such version creates an absolute legal defense, he is entitled to a directed verdict of acquittal.
In those cases in which the defendant is the only eyewitness to the slaying, and in which the Weathersby rule is inapplicable (i.e., the defendant does not secure a directed verdict of acquittal), it then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either *Page 34 
convict or acquit. See, Layne v. State, 542 So.2d 237 (Miss. 1989); Lanier v. State, 533 So.2d 473 (Miss. 1988); Smith v.State, supra; Wetz v. State, 503 So.2d 803 (Miss. 1987);Harveston v. State, supra; Fuller v. State, 468 So.2d 68 (Miss. 1985); King v. State, 315 So.2d 925 (Miss. 1975); Pace v.State, 298 So.2d 694 (Miss. 1974).
The Weathersby rule, as Harveston makes clear, is not a jury instruction, but a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict.
It should be noted that the cited decisions deal with evidence in those cases of murder committed with a deliberate design to effect the death of the person killed. Here, Michael was charged with another type of statutorily-defined murder: "when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." He did not at trial, nor has he on appeal contended he should not have been indicted under this section.Jones v. State, 169 Miss. 292, 152 So. 879 (1934). We can see no reason why the rationale of Weathersby and Harveston
should not apply with equal force in a killing of this nature as well as one in which the defendant is charged with murder by deliberate design. We therefore hold that a jury issue was created as to whether Michael was guilty as charged in the indictment. Michael's conduct and statements following the killing were not consistent with that of a person who has accidentally killed a friend.
The jury in fact convicted him of manslaughter, a clearly lesser included offense within that with which Michael was charged. We hold that there was sufficient evidence to support his conviction.
 EVIDENCE OF SEPARATE OFFENSE
Prior to trial the circuit judge sustained a defense motion in limine to prevent the state from offering into evidence proof of a previous instance in which Michael had gotten his mother's pistol out when he and Lemon were alone in the apartment, waved it, and told Lemon, "I will shoot you, man."
Michael's testimony on direct examination is above set forth. The record shows the following cross-examination of Michael:
 Q. So, when you load the gun you knew the gun was loaded, didn't you?
 A. No.
 Q. You didn't know it was loaded. This is not the first time that you ever loaded that gun, is it?
 A. Yes.
 Q. It is?
 A. Yes.
 Q. It's not the first time you ever showed your friends the gun, is it?
 A. No.
 Q. The truth of the matter is you showed James Lemon this gun in the latter part of the summer of 1986, didn't you?
 A. Yes.
 Q. You took the gun out and you-all were fussing over some cookies and —
 BY MR. STANFIELD:
 If it please the Court, I'm going to object to that.
 BY THE COURT:
 All right. Be sustained.
 Q. Have you ever pointed this gun at anybody else?
 A. No.
 Q. When your lawyer asked you some questions you said that you didn't know much about the gun, about the pistol, you didn't know anything, but the truth of the matter is you had handled this gun before, haven't you?
 A. Yes.
 Q. In fact, you had pointed this gun at some of your friends before, haven't you?
 A. No.
 BY MR. COXWELL:
 We object, Your Honor.
 BY MR. WRIGHT:
 He's on cross examination, Your Honor. It is relevant.
 BY THE COURT:
 I overrule the objection. *Page 35 
 BY MR. COXWELL:
 I would like for the record to be clear we covered this in pre-trial and the Judge sustained our motion.
 BY MR. WRIGHT:
 He's subject to cross examination wide open scope. You opened the door when you asked about his familiarity with —
 BY MR. COXWELL:
 Objection.
 BY THE COURT:
 I overruled the objection.
 Q. The truth of the matter is you took this gun out, loaded it and you pointed the gun at James Lemon, didn't you?
 A. Yes.
 Q. And, when you told me — what were you doing when this happened?
 A. We wasn't doing anything.
 Q. Was your mama at home?
 A. No.
 Q. The truth of the matter is you —
 BY MR. STANFIELD:
 Objection as to relevancy. We'd like a continuing objection.
 BY THE COURT:
 Yes, sir. I continually overrule.
 Q. You had to go to the bedroom to get the gun, didn't you?
 A. Yes.
 Q. And, you had — the police found it in the bedroom, didn't they?
 A. Yes.
 Q. Now, when you got the gun out there were only two people there in that house, you and James Lemon. Isn't that right?
 A. Yes.
 Q. You pulled the gun out. Did you point it at him?
 A. No.
 Q. What did you tell him when you got the gun out?
 A. I don't remember.
 Q. The truth of the matter is you said, "Man, I'll shoot you." Didn't you?
 A. I don't remember.
 Q. You-all were fussing over some cookies. Do you remember that?
 A. Yes.
 Q. And, you said, "Man, I'll shoot you." And, you got up and pointed the gun and then Lemon said, "I'll leave." And, then you said, "Well —" you started bragging and said, "It wasn't loaded." He got real nervous about it and said, "That's the kind of gun that kills folks." And, he left your house, didn't he?
 A. Yes.
 Q. He got so scared of you he left your house, didn't he?
 BY MR. STANFIELD:
 Your Honor, we object and ask to approach the bench.
 BY THE COURT:
 Yes, sir.
 (Conference was had at the bench between the Court and the attorneys.)
 BY THE COURT:
 I overrule the objection.
 BY MR. STANFIELD:
 May I put it in the record at recess?
 BY THE COURT:
 Yes, sir. I will let the jury step out and you can put it in the record now. (At this time the jury was retired from the court room and the following proceedings were had out of their presence and hearing.)
 BY MR. STANFIELD:
 The defendant had a continuing objection to this line of questioning on cross examination by the District Attorney, but the defendant feels compelled to object on a question by question basis in that the District Attorney under the guise of trying to show routine or habit is trying to bring in a separate and distinct crime that of pointing a gun and threatening by this defendant on a previous occasion with a party not in — a party not to this lawsuit at a remote time merely to prejudice this jury. The defendant has testified that he did not know how to operate this handgun and the District Attorney through the guise of impeachment is attempting to bring in separate and distinct crimes in order to impeach him on something that is unimpeachable. *Page 36 
He's admitted that he knows nothing about the operation of the handgun and the District Attorney by trying to state and testify to this jury that he made a threat does not show that he knows how to operate the handgun. So, it's a ploy by the District Attorney to try to see that Michael Blanks does not receive a fair trial for which the defendant must strenuously object, if the Court please.
 BY MR. COXWELL:
 We'd like in addition to object in that it's not relevant in that he's trying to prove some unrelated, remote incident that Michael acted in conformity with that time. That's absolutely in admissible sic] under every Supreme Court ruling.
 BY MR. STANFIELD:
 May it please the Court, I would respectfully submit, number one, defense lawyer asked questions of the defendant of what did he know about the pistol, he answered nothing. He's on cross examination and I have a right to impeach him on that. I'm showing that he's had contact with this gun particularly around other people. He's claiming in his defense an accident and no knowledge of the gun. I'm showing to the jury that he did have knowledge of the gun and knew where it was located, he knew how to load it. He also knew that the danger involved with the gun, in addition that he had done the same thing to another person, namely, James Lemon. And, as to the objection of the other crimes rule it goes to the identity of the accused with the gun. It also goes to the knowledge, guilty knowledge, pertaining to the particular gun and also cross examination that lied when he testified to defense counsel that he knew nothing about the pistol.
 BY THE COURT:
 Well, I've overruled the objection to the last question you asked him — it was what?
 BY THE REPORTER:
 (Reading) "Question: He got so scared of you he left your house, didn't he?"
 BY THE COURT:
 I sustain the objection to that question.
 BY MR. STANFIELD:
 Your Honor, we would move for a mistrial.
 BY THE COURT:
 Motion for mistrial is overruled.
 * * * * * *
 (Then after a recess the following occurred.)
 Q. Now, when Mr. Lemon — James Lemon — was at your house and you had this gun out, didn't you?
 A. Yes.
 Q. I can't hear you.
 A. Yes.
 Q. And, you got it from the closet, didn't you?
 A. Yes.
 Q. It was loaded at that time, wasn't it?
 A. No.
 Q. Was it on safety or the safety on or off?
 A. I don't know.
 Q. And — show me how you did this gun with Mr. Lemon.
 A. About like that.
 Q. What did you say to him?
 A. I don't remember.
 Q. The truth of the matter is you told him, "I will shoot you, man." Didn't you?
 A. I don't remember.
 Q. I can't here [sic] you, Mr. Blanks.
 A. I don't remember.
 Q. And the truth of the matter is you were arguing over some cookies. Isn't that the truth?
 A. Yes.
 Q. Now, once he left did you put the gun back up in the closet?
 A. Yes.
(T-II. 158-165) [Emphasis added]
Michael argues that this cross-examination of him as to the previous instance with Lemon was prejudicial error.
This brings us to the issue in this case. Was Michael guilty of murder by committing *Page 37 
an act eminently dangerous to others, evincing a depraved heart, regardless of human life, although without any premeditated design to kill Pap? Jones v. State, supra; Neighbors v. State,361 So.2d 345 (Miss. 1978); Bass v. State, 54 So.2d 259 (Miss. 1951).
Michael's defense was that the killing was accidental when he was showing Pap how the pistol worked. According to him, he had put a cartridge in the pistol, pulled a lever back, taken the cartridge back out, and was putting the pistol back on safety when it fired.
The State argues that because of Michael's testimony on direct examination he opened the door to this cross-examination. Michael's testimony on direct examination simply stated (1) he had never shot the gun before, (2) his mother had never given him any instruction, and (3) he knew he was not supposed to handle it.
On cross-examination he was asked about a past instance in which, following a quarrel with his friend Lemon over some cookies, he had gotten the pistol out, waved it, and threatened to shoot Lemon. Clearly no such line of inquiry was opened by the direct examination. Nothing on Michael's direct examination denied or suggested that the instance with Lemon had never occurred. At the very outside, the most the State should have been permitted to ask him was whether or not on a previous occasion he had handled the weapon in the presence of Lemon. And stopped there.
Rule 404(b) Mississippi Rules of Evidence states:
 (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Clearly, under the first sentence of this section the instance of waving the pistol at Lemon was inadmissible. The only reason for offering this instance into evidence — as the district attorney himself stated — was an attempt by the State to show that the episode with Pap was a repetition with tragic consequences of precisely what Michael had previously done with Lemon.
The first sentence of this rule is a recognition of the well-settled principle of law that generally evidence of other wrongs is inadmissible in the trial of an accused. Davis v.State, 530 So.2d 694 (Miss. 1988); Robinson v. State,497 So.2d 440 (Miss. 1986); Brown v. State, 483 So.2d 328 (Miss. 1986); Fisher v. State, 481 So.2d 203 (Miss. 1985); Quinn v.State, 479 So.2d 706 (Miss. 1985); Tobias v. State,472 So.2d 398 (Miss. 1985); Donald v. State, 472 So.2d 370 (Miss. 1985). Offering into evidence proof of other similar crimes for the purpose of showing an accused more likely to be guilty by virtue of having engaged in the same sort of acts before is, and always has been, inadmissible. Offering evidence of previous recklessness with the pistol in an effort to prove or suggest reckless conduct when Pap was killed was no different in principle than offering evidence of a previous accident caused by a defendant's drunken driving to support an indictment of manslaughter arising from culpable negligence in driving while intoxicated.
As the rule and comment thereunder state, past conduct may be admissible for some other purpose to show identity, knowledge, intent, motive, or absence of mistake or accident, which limited exceptions have also been consistently allowed by previous decisions of this Court. Carter v. State, 450 So.2d 67 (Miss. 1984). The testimony pertaining to the instance with Lemon did not come under any other purpose under this section, however, and therefore was inadmissible.
As in Harveston this was a case in which the jury could very well have returned a verdict of not guilty. Indeed they did reduce the crime to manslaughter.
Admission of this evidence in this type of case was prejudicial and we must reverse.
As the other errors complained of will not recur on retrial, we do not address them.
REVERSED AND REMANDED. *Page 38 
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN and BLASS, JJ., concur.
ANDERSON, J., dissents without written opinion.
PITTMAN, J., not participating.