COLEMAN, J.,
for the Court:
¶ 1. A grand jury indicted the appellant, Alberta Ford, for the murder of her husband, Kelvin Ford, but the trial jury in the Circuit Court of Lee County returned its verdict of “Guilty of manslaughter.” Pursuant to that verdict, the trial court entered its judgment of Alberta Ford’s conviction of the felony of manslaughter. Two days later, after a pre-sentencing investigation had been completed, the trial court entered an order by which it sentenced Ford to serve a term of twelve years in “a facility to be designated by the Mississippi Department of Corrections.” Ford appeals to present two issues for our review and resolution, which we quote verbatim from Ford’s brief:
1. THE TRIAL COURT ERRED OVERRULING HER REQUEST FOR A PEREMPTORY INSTRUCTION AT THE CLOSE OF THE STATE’S CASE, PURSUANT TO THE WEATH-ERSBY RULE; AND
2. THE TRIAL COURT ERRED IN NOT GRANTING THE APPELLANT’S MOTION FOR JUDGMENT OF ACQUITTAL JNOV OR IN THE ALTERNATIVE, A NEW TRIAL, BASED UPON HER ASSERTION THAT THE JURY VERDICT WAS AGAINST THE GREATER WEIGHT OF THE EVIDENCE.
Notwithstanding appellant Ford’s adroit analysis of the evidence adduced by both the State and Ford, this Court affirms.
I. FACTS
¶ 2. Booze, beer, barbecue, and a birth were among the facts in this case. On July 22, 1995, Bobby Gene Berry, a friend of Ford; Gladys Geneva Richey, Ford’s daughter; Mary J. Young, Ford’s other daughter who was pregnant; and Bernard Young, Ford’s nephew; among others, gathered at the apartment occupied by Ford and her husband in Tupelo to enjoy a meal of barbecue. All, including Alberta Ford, were drinking beer, and some, including Kelvin Ford, were drinking both beer and whiskey. Around 7:30 o’clock that evening, Mary J. Young left the Fords’ apartment and was taken by her companion to the hospital, where she gave birth to her baby later that same evening. Ms. Young’s baby was born after Kelvin Ford had succumbed to the infliction of a wound to his heart caused by a steak knife held by Alberta Ford.
¶ 3. After Ms. Young left, Bernard Young asked his aunt Alberta if she was going to get some beer. Because Alberta had no money, Bernard Young gave her a one-hundred-dollar bill to buy the beer before Alberta Ford went to the hospital to be with her daughter. Alberta Ford and Bobby Gene Berry left the apartment and got into the Fords’ automobile to go buy the beer. Once Ford was in the car, she realized that she did not have the keys to the car. She got out of the car, entered the apartment, and went into the bedroom where her husband Kelvin Ford was lying on the bed, apparently asleep. Alberta Ford awakened her husband when she reached into his pants pocket to get the car keys.
¶ 4. When Kelvin Ford awoke, he asked, ‘What are you doing?” When Alberta Ford replied, “I’m getting the keys,” Kelvin Ford replied, “You ain’t getting no key [sic].” An argument ensued, during which the Fords scuffled. In the midst of their scuffling, Alberta Ford went into the kitchen, where she got a steak knife and put it in a back pocket on her pants. Kelvin Ford, who had followed her into the kitch *345 en, pushed Alberta Ford back into the bedroom, where the Fords resumed scuffling. Alberta Ford pulled the knife from the back pocket of her pants and held it in front of her. While she held the knife in front of her pointed at her husband, Kelvin Ford sustained a puncture wound through his sternum and into the left ventricle of his heart. The manner in which Alberta Ford inflicted this fatal wound is at issue in this case.
¶ 5. Someone in the Fords’ apartment called 911. Tupelo Police Officer Marion Morrow was on patrol when he received notice of the stabbing at approximately 9:14 p.m. that evening. He and other police officers converged on the Fords’ apartment in Tupelo, where they found Kelvin Ford lying in a pool of blood on the bedroom floor. An ambulance took Kelvin Ford to the hospital, where he died during surgery. Alberta Ford was arrested and taken to the Tupelo Police Headquarters, where she subsequently gave a statement about the events earlier that evening which culminated in her husband’s death.
II. TRIAL
¶ 6. The grand jury indicted Alberta Ford for the “wilful, unlawful and felonious and with malice aforethought” murder of her husband, Kelvin Ford. Among the witnesses whom the State called were Officer Marion Morrow and Detectives Bart Aguirre and Teresa Broadway, all with the Tupelo Police Department. They testified about their various roles in the investigation of the death of Kelvin Ford and the arrest and detention of Alberta Ford. The State also called Alberta Ford’s daughter, Gladys Geneva Richey, who testified about her observation of the argument and subsequent scuffle between Kelvin and Alberta Ford and about her futile effort to wrest the knife from her mother’s grasp before Kelvin Ford received his fatal wound. Without objection from Alberta Ford, the State introduced into evidence a written statement which she had given Detective Aguirre after she had been taken to the Tupelo Police Headquarters.
¶ 7. For her witnesses, Alberta Ford called Thomas Richey, her brother; Jimmy Richey, her brother; Bernard Young, her nephew; and Mary J. Young, her daughter. Alberta Ford was the last to testify. We reserve further review of the testimony of the State’s and Ford’s witnesses for our resolution of Ford’s two issues, at the heart of both of which lies the sufficiency and weight of the testimony of these witnesses.
III. REVIEW AND RESOLUTION OF THE ISSUES
A. Ms. Ford’s first issue

1. Ford’s argument

¶ 8. In her statement of the issues required by Rule 28(a)(3) of the Mississippi Rules of Appellate Procedure, Ford presents the following first issue for our review, analysis, and resolution: “The trial court erred overruling her request for a peremptory instruction at the close of the State’s case, pursuant to the Weathersby [r]ule.” In Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933), the Mississippi Supreme Court enunciated the rule as follows:
[WJhere the defendant or the defendant’s witnesses to the homicide are the only eye witnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
¶ 9. Ford admits that she was holding the knife when it penetrated her husband’s sternum and punctured the left ventricle of his heart, but she declares that the following facets of the testimony and physical evidence are consistent with her innocence and uncontradicted by the State’s evidence. Alberta Ford testified that she obtained the knife in the kitchen in order *346 to scare Kelvin Ford into giving her the keys to the Fords’ car so that she could buy some beer. She further testified that she never intended to harm her husband and that her wounding him in the chest with the steak knife was an accident.
¶ 10. Ford’s daughter, Gladys Geneva Richey, the only other eyewitness to Kelvin Ford’s death, testified that Kelvin Ford “stepped toward the knife.” Richey then elaborated, “He made one step toward her, and that’s when [the knife] went in. I never saw [my mother] — I never saw her stab him. He made a step toward her.” Bobby Gene Berry, who had waited in the Fords’ car until she decided to reenter the Fords’ house to learn why Alberta Ford had not returned with the car keys, testified that after she had gone back into the house, Alberta Ford emerged from the bedroom not seeming to understand what Berry was saying to her. Berry added that Ford “didn’t realize, you know, what — what was going on.” According to Berry, “[Ford] just seemed like she didn’t know what she had did [sic].... ” Under cross-examination, Tupelo Detective Bart Aguirre testified that Ford told him that she did not mean to stab her husband. Detective Aguirre further testified that Ford was emotionally distraught and was extremely concerned for her husband’s condition. He added that Ford showed remorse and fear for what was happening to her husband when the detective questioned her.
¶ 11. Ford further maintains that the nature of Kelvin Ford’s stab wound as described by Dr. Stephen Hayne, the pathologist who performed the post mortem examination of Kelvin Ford’s corpse, was consistent with her testimony that her husband walked onto the knife as she held it. For one thing, the post mortem report established that there were neither “fist contusions” nor bruises such as might have been caused by a hilt on a knife around the puncture. Therefore, Ford argues that the absence of such bruises “reflects that the knife did not enter [Kelvin Ford’s] chest wall ... with any real force, as there would have been at least a minimal fist contusion.... ” About the fatal wound, Ford emphasizes that it was consistent with a straight in-and-out movement because, according to the post mortem report, there was little deviation from the point of entry of the knife. Ford insists that a stab wound caused by an angry assailant would have manifested more of a slashing characteristic. She concludes that “the autopsy report ... is wholly consistent with Alberta Ford’s defense of accident or misfortune; thus, the problem of physical evidence’s not corroborating [her] version of events does not exist in this case.”
¶ 12. Ford then insists that the testimony of her daughter, Gladys Geneva Richey, whom the State called as its witness, corroborates Ford’s testimony that Kelvin Ford walked onto the knife and that Alberta Ford “never made a move toward [her husband] with the knife.”

2. The State’s argument

¶ 13. The State begins its argument with the observation that “[b]asically, [Ms. Ford] is asserting accident as a justification for homicide.” It then protests, “Accident only applies if the defendant was doing a lawful act when the accident occurred. Pointing a knife at Kelvin [Ford] to scare him and induce him into giving [Ms. Ford] the car keys was not a lawful act.” Whether the State is uncertain about the thrust of Ms. Ford’s argument or whether it is conscientiously countering every aspect of Ms. Ford’s argument, the State adds that “her testimony at trial was not consistent with [self-defense].” The State correctly notes that Ms. Ford testified that “she was not in fear when she held the knife and pointed it at [her husband].” Ms. Ford further testified that her life was not in danger when she got and kept the steak knife which ultimately claimed her husband’s life. The State concludes: “Either way, her testimony at trial was not consistent with innocence.”

*347
S. Analysis and resolution of the issue

a. Ms. Ford’s theories of defense
¶ 14. Never did Ms. Ford deny that she was holding the steak knife pointed toward her husband when it fatally punctured his heart. Instead, Ms. Ford’s argument is that the slaying of Kelvin Ford, her husband, was either justifiable because she stabbed him in self-defense or excusable because it was accidental.[1] Ms. Ford’s counsel requested, and the judge granted, instructions to the jury on both of these defenses. Pursuant to those instructions, Ms. Ford’s counsel advanced both defenses in his closing argument to the jury.
b. The State’s counter-argument
¶ 15. The State counters that the evidence is consistent with Ms. Ford’s being the aggressor because she first went into the kitchen where she got the steak knife, which ultimately claimed her husband’s life. The State stresses Ms. Ford’s testimony that when she went to get the knife that night she was not threatened and that she was not afraid for her life. The State maintains that Ms. Ford’s theory of accident lacked merit because, as the prosecutor stated in closing argument, “No individual is going to walk into a sharp, pointed knife and continue putting pressure enough that it will go through his skin and through his heart to kill him.”
¶ 16. In its brief, the State also suggests that Ms. Ford’s pointing the knife at her husband constituted an assault, which was an unlawful act. Section 97-3-7 of the Mississippi Code provides that “[a] person is guilty of simple assault if he ... attempts by physical menace to put another in fear of imminent serious bodily harm....” Miss.Code Ann. § 97-3-7(1) (Supp.1998). Therefore, according to the State, Section 97-3-17 of the Mississippi Code, which prescribes the circumstances under which a homicide is “excusable,” would prohibit Ms. Ford’s defense that the stabbing of her husband was an accident because her holding the knife with its point toward her husband was a simple assault and, thus, an unlawful act. However, we need not consider this aspect of the State’s argument because the State did not raise it before the trial court but, instead, did not object to the trial court’s granting instructions of law on the subject of an excusable homicide which Ms. Ford requested.
c.Standard of review
¶ 17. In Blanks v. State, 547 So.2d 29, 34 (Miss.1989), the Mississippi Supreme Court reminded the bench and bar: “The Weathersby rule ... is not a jury instruction, but a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict.” The Mississippi Supreme Court has established the following standard of review for determining whether the trial judge erred in denying a motion for a directed verdict:
In considering a motion for directed verdict, the reviewing court must consider evidence introduced in light most favorable to the State, accepting all evidence *348 introduced by the State as true, together with all reasonable inferences therefrom; if there is sufficient evidence to support a guilty verdict, motion for directed verdict must be overruled. If the evidence presents an issue for determination by the jury, then the case must be submitted to the jury and will not be disturbed, if evidence and those inferences support the guilty verdict.
In reviewing the question of whether a verdict is sufficiently supported by the evidence, the Supreme Court is required to look at the totality of the circumstances, and “[o]ur concern here is whether the evidence in the record is sufficient to sustain a finding adverse to [the defendant] on each element of the offense.... [W]ith respect to each element, of the offense, [we must] consider all of the evidence' — -not just the evidence which supports the case for the prosecution — in light most favorable to the verdict.”
Yates v. State, 685 So.2d 715, 718 (1996) (citations omitted).
¶ 18. Because Ms. Ford called witnesses and adduced evidence to support her defenses of accident or misfortune and self-defense to the crime of murder after the State rested, she waived her right to challenge the sufficiency of the evidence against her when the State rested its case in chief. “A defendant waives the appeal of an overruled motion for a directed verdict made at the end of the state’s case when the defendant chooses to go forward with its case.” Esparaza v. State, 595 So.2d 418, 426 (Miss.1992) (citing Wetz v. State, 503 So.2d 803, 808 (Miss.1987)). Instead, her challenge to the sufficiency of the evidence must be considered in light of “the evidence before the court ... on the last occasion when the sufficiency of the evidence was challenged before the trial court.” McClain v. State, 625 So.2d 774, 778 (Miss.1993); Wetz v. State, 503 So.2d 803, 807-08 n. 3 (Miss.1987). Here, of course, that was when the circuit court overruled Ms. Ford’s motion for directed verdict which she presented to the trial court after both she and the State had finally rested. Wetz, 503 So.2d at 808 n. 3.
d. Ms. Richey’s testimony that Kelvin Ford walked into the knife
¶ 19. We review Ms. Richey’s testimony to evaluate whether it corroborates Ford’s theory of her innocence, which is that she did not stab Kelvin Ford, but, instead, he walked into the knife as she pointed it at him with the intent only to scare him; hence, his death was accidental. Ms. Rich-ey testified that she and her two children, ages eleven and eight, arrived at her mother’s apartment around 8:30 that evening. She left her two children in her car, entered the apartment, found nobody in the living room, and proceeded back to the bedroom where her mother and Kelvin Ford slept. There, she found Alberta Ford and Kelvin Ford “scuffling on the bed.” Ms. Richey never saw Kelvin Ford hit her mother while they were scuffling on the bed. Neither did Ms. Richey see Kelvin Ford choke her mother. Ms. Rich-ey “tried to pull them apart on the bed,” and eventually the Fords got off the bed. However, they continued to “pull[] each other’s shirt.” She heard her mother, Alberta Ford, say that Kelvin Ford had choked her.
¶ 20. According to Ms. Richey, the Fords continued to argue “[t]en, fifteen — fifteen minutes back and forth.” When Ms. Ford said that she would hit Kelvin Ford, Mr. Ford replied that “he’d hit her back.” However, Ms. Richey testified that neither hit the other. Ms. Richey “turned around to get the kids out — out of the doorway,” where she saw them standing. When Ms. Richey “turned back around,” she “first saw it [the knife]. It was in her [mother’s] hand.” Ms. Richie grabbed the knife, but she let go of it because she was afraid that she would cut her hand. Ms. Richey then explained:
Then he — he stepped toward the knife. [Kelvin Ford] made one step toward her *349 [Alberta Ford], and that’s when it went in. I never saw her [Alberta Ford] — I never saw her stab him. He made a step toward her.
The assistant district attorney then asked:
Did you not tell Officer Aguirre and Officer Broadway and Officer Chaffin that “I let go of the knife and before I could do anything else, Mamma had stabbed Kelvin?” Did you not say that?
Ms. Richey answered, “Yes, I said that.” She admitted that the statement she signed for the officers contained the statement that “[M]amma had stabbed Kelvin,” but she then explained:
At that time that was the best way that I could describe it. It happened so fast, and stabbing was the best way I could describe it at that time.
Ms. Richey further admitted that when she called 911, she told the operator that “there had been a stabbing.”
¶ 21. Under cross-examination by defense counsel, Ms. Richey explained that she used the word “stabbing” when she called 911 and talked to the police detectives “[b]ecause at that time that was the best word that I knew how to explain.” To defense counsel’s next question, “Did you mean that your mother had pushed, or shoved, or stuck the knife in Kelvin when you used that word?” Ms. Richey replied, “No.” Defense counsel asked, “Did you see any movement in Alberta [Ford’s] hand that was holding the knife?,” and Ms. Rich-ey answered, “No, Sir.”
¶ 22. On re-direct examination, the assistant district attorney asked, “[Y]ou did not tell the police, ‘Kelvin walked into a knife in my mamma’s hand,’ did you?” Ms. Richey replied, “No, Sir.” Ms. Richey further admitted that she did not tell the police, “I never saw mamma’s hand move.” In her brief, Ms. Ford offers an explanation for her daughter’s use of the word “stab,” which is that it “would be a perfectly natural word to use, regardless of the way in which the stab wound occurred. This was completely explained by Ms. Richey in cross-examination.... ”
e. Ms. Alberta Ford’s explanation of the cause of Kelvin Ford’s death
¶ 23. The statement which Ms. Ford gave Detectives Aguirre and Broadway described the events earlier that evening which culminated in the death of Kelvin Ford. Her statement contained the following sentences:
“He [Kelvin Ford] started coming towards me, and I reached and got the knife out of my back pocket and held it out in front of me. He started coming back on me again, and when he got up on me, I pushed the knife forward towards his chest. Kelvin looked real surprised when I stuck him.”
During the assistant district attorney’s cross-examination of Alberta Ford, he referred to the portion of the statement, “I pushed the knife forward toward his chest.” Ms. Ford offered the following explanation for that statement:
No, I told [Detective Broadway] I didn’t know whether I had pushed [the knife] or whether [Kelvin Ford] had walked up on me. I explained that to her. She said, “Well, we’re just going to go ahead and do it like this.” You know, ‘cause I was upset then. I said, “I don’t know. I don’t know whether I pushed it or whether he walked up on it.”
¶ 24. In her brief, Ms. Ford explains her statement that she “pushed the knife forward toward his chest” as follows:
“These statements are clearly reasonable given the reaction, which is within common knowledge, that people who are involved in accidents and shocking situations often do not remember the details of what happened; indeed, there are many details that Alberta Ford does not remember, including ... her daughter’s presence in the room at the time of the incident.”
¶ 25. This Court finds the following portion of the State’s cross-examination of Ms. Ford relevant to her explanation of her *350 inability to remember some of the details of the events about which she gave the statement to the Tupelo detectives and about which she testified:
Q. Ms. Ford, were you drunk at that time?
A. I can’t — well, to my knowledge I wasn’t, but, you know.
Q. You could have been?
A. Could have been. I ain’t going to say. Could have been.
Q. Can you — can you tell this jury that while you were in the bedroom with Kelvin and you had that knife back there that your life was not in any danger, was it?
A. No, sir.
Q. And you don’t remember whether you reached out and stabbed him or not; is that right?
A. No, sir.
f.Inconsistencies in Ms. Ford’s explanation of the cause of her husband’s death
¶ 26. About the relationship between the Weathersby rule and a defendant’s prior inconsistent statements, the Mississippi Supreme Court opined in Blanks:
And, there is still another circumstance which still precludes the application of the Weathersby rule, and that is where the accused, following the slaying, gives conflicting versions of how the killing took place, or initially denies the act.
Blanks, 547 So.2d at 33. Ms. Ford told Detectives Aguirre and Broadway that “when [her husband] got up on me, I pushed the knife towards his chest.” She further told the detectives that “Kelvin looked real surprised when I stuck him.” These statements to the detectives conflict with Ms. Ford’s testimony during her trial that her husband stepped forward onto the knife which she was holding only to frighten him. Moreover, under the assistant district attorney’s cross-examination, Ms. Ford admitted that as of the date of the trial, she did not remember whether she reached out and stabbed him or not. These inconsistencies in Ms. Ford’s statements to the detectives and her trial testimony are sufficient to preclude the application of the Weathersby rule to require that the trial judge grant her motion for a directed verdict even after she had rested.
¶ 27. As for Ms. Richey’s testimony that the knife went in when Kelvin Ford made one step toward Ms. Ford, that testimony was contradicted by her statement to Detectives Aguirre and Broadway and Officer Chaffin that she let go of the knife in her mother’s hand but before she “could do anything else, Mamma had stabbed Kelvin.” Ms. Richey explained her use of the word “stabbing” when she called 911 and talked to be police officers “[b]ecause at that time that was the best word I knew how to explain.” She elaborated that when she used the word “stabbing,” she did not mean that her mother “had pushed, or shoved, or stuck the knife in Kelvin.” This Court opines that these inconsistencies in the testimony of Ms. Rich-ey, an eyewitness to the ultimately fatal penetration of the knife into Kelvin Ford’s heart, created issues of her credibility that only a jury as the finder of facts could resolve.
g.Other evidentiary matters which Ford asserts are consistent with her innocence
¶ 28. Ms. Ford further maintains that the “straight in and out” direction of the knife combined with the absence of a fist or hilt bruise around the fatal wound indicates that too little force was applied to the knife-point to be consistent with her intent to kill her husband. Nevertheless, the supreme court has opined that “[w]hether or not a killing was the result of accident or misfortune is a question for the jury to decide after proper instruction.” Miller v. State, 677 So.2d 726, 730 (Miss.1996). (citing Day v. State, 589 So.2d 637, 643 (Miss.1991)).
h.Summary
¶ 29. The Weathersby rule is but “a guide for the circuit judge in determin *351 ing whether a defendant is entitled to a directed verdict.” See Blanks, 547 So.2d 29 at 34. This Court “must consider evidence introduced in the light most favorable to the State,” and it must “accept[ ] all evidence introduced by the State as true.” See Yates, 685 So.2d at 718. If the evidence presents an issue for the jury’s determination, then the case must be submitted to the jury. Id. “It is enough that the conflicting evidence presented a factual dispute for jury resolution.” Gandy v. State, 373 So.2d 1042, 1045 (Miss.1979). This proposition is true even if it is the evidence adduced by the accused which creates the conflicts. Hence, the supreme court has opined that “where the accused ... gives conflicting versions of how the killing took place ...,” “application of the Weathersby rule” is precluded. See Blanks, 547 So.2d at 33.
¶ 30. Our review of the evidence as of when both of the State and Ms. Ford had rested has demonstrated several conflicts in the various accounts of Kelvin Ford’s death which both Ms. Ford and her daughter, Ms. Richey, an eyewitness to the affray which resulted in Kelvin Ford’s death, gave. This Court finds Ms. Ford’s valiant efforts to explain these conflicts which she includes in her brief unavailing. Instead, her explanatory efforts demonstrate that the supreme court’s preclusion of the application of the Weathersby rule where .the accused “gives conflicting versions of how the killing took place” which it set forth in Blanks, is applicable in the case sub judice to resolve this issue adversely to Ms. Ford and to affirm the trial court’s denial of her motion for directed verdict which she made after both she and the State had rested.
B. Ms. Ford’s second issue
¶ 31. Ms. Ford’s second issue, which we previously quoted, both attacks the sufficiency of the evidence to support the jury’s verdict that she was guilty of manslaughter in the death of her husband and argues that the jury’s verdict “was against the greater weight of the evidence.” Our resolution of Ms. Ford’s first issue, ie., that the Weathersby rule was inapplicable in this case, also resolved that the evidence was sufficient to support the jury’s verdict of “Guilty of manslaughter.”
¶ 32. In Morgan v. State, 681 So.2d 82, 93 (Miss.1996), the supreme court reiterated the oft-quoted standard of review for determining whether the jury’s verdict in a criminal case was so against the overwhelming weight of the evidence that a new trial ought to have been granted:
We will not reverse a trial judge’s denial of a motion for a new trial unless we are convinced that the verdict is so contrary to the weight of the evidence that, if it is allowed to stand, it would sanction an unconscionable injustice.
¶ 33. Ms. Ford never denied that she was holding the steak knife which she got from the kitchen when it inflicted its fatal wound on Kelvin Ford. Instead, she offered the defenses that her husband’s homicide was either justifiable because she acted in self-defense or excusable because it was accidental. The jury’s verdict of “Guilty of manslaughter” demonstrated that it rejected both defenses. The inconsistencies which this Court found in its review and analysis of the evidence presented by Ms. Ford combined with the fact that Ms. Ford was holding the knife when it fatally punctured the left ventricle of her husband’s heart persuade this Court that no “unconscionable injustice” resulted from the trial court’s denial of Ms. Ford’s motion for new trial based on the ground that “[t]he jury’s verdict was against the overwhelming weight of the evidence.” This Court affirms not only the trial court’s denial of Ms. Ford’s motion for a new trial but also its judgment of the appellant’s conviction of manslaughter and its subsequent order by which it sentenced Ms. Ford to “serve a term of twelve (12) years in a facility to be designated by the Mississippi Department of Corrections.”
¶ 34. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY OF *352 THE APPELLANT’S CONVICTION OF MANSLAUGHTER AND ITS SENTENCE OF THE APPELLANT TO SERVE TWELVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., DIAZ, IRVING, KING, LEE, PAYNE, AND SOUTHWICK, JJ., CONCUR.

. Section 97-3-15 of the Mississippi Code establishes self-defense as a justification for a homicide in the following language:
(1) The killing of a human being by the act, procurement, or omission of another shall be justifiable in the following cases:
(f) When committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished....
Miss.Code Ann. § 97-3-15 (Rev. 1994).
Section 97-3-17 of the Mississippi Code establishes accident or misfortune as an excuse for a homicide in the following language:
The killing of any human being by the act, procurement, or omission of another shall be excusable:
(a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation....
Miss.Code Ann. § 97-3-17 (Rev.1994).