KITCHENS, Justice,
Dissenting:
¶ 40. Because Chad Booker was entitled to a directed verdict of acquittal, I dissent.
¶ 41. In Weathersby v. State, 165 Miss. 207, 147 So. 481, 482 (1933), this Court held that:
[i]t has been for some time the established rule in this state that where the defendant or the defendant’s witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
¶ 42. In a recent decision, this Court acknowledged that “[t]he Weathersby rule is alive and well and living in the courtrooms of this state.” Johnson v. State, 987 So.2d 420, 424 (Miss.2008) (quoting Heidel v. State, 587 So.2d 835, 839 (Miss.1991)). “The Weathersby principle is not to be casually applied, but when the facts warrant, it becomes efficacious.” Dew v. State, 309 So.2d 857, 857 (Miss.1975) (citations omitted). Moreover, “[wjhere the Weathersby rule applies and the defendant’s version affords an absolute legal defense, the defendant is entitled to a directed verdict of acquittal.” Green v. State, 631 So.2d 167, 174 (Miss.1994) (citing Blanks v. State, 547 So.2d 29, 33 (Miss. 1989)). However, “where the defendant’s story is materially contradicted, the Weathersby rule has no application and the matter of conviction versus acquittal becomes a question for the jury.” Id. “Weathersby ... is nothing more than a particularized version of our general standards according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment of acquittal as a matter of law.” Johnson v. State, 987 So.2d at 425 (quoting Jackson v. State, 551 So.2d 132, 136 (Miss.1989)).
¶ 43. In Dew, the accused was tried for the murder of his wife. Dew, 309 So.2d at 857. Dew was convicted of manslaughter and sentenced to serve eight years in the state penitentiary. Id. At trial, Dew testified that no other individual had been present when he accidentally shot and fatally wounded his wife. Id. Dew was the only person to testify to the events leading *978 up to his wife’s demise. Id. at 858. He said that he was in bed when his wife returned home from an outing with friends, and that he believed she was intoxicated. Id. Dew said that his wife was argumentative and that she had struck him several times during the confrontation. Id. Because of his wife’s behavior, Dew said that he had instructed her to go to her mother’s home until the next morning. Id. She refused and attempted to strike Dew again. He blocked the blow, and she seized him by the neck and scratched him. Id. Dew said that he had been able to push her away, but that she then had picked up a pistol that was lying on the night stand and threatened to kill him. Id. During the ensuing struggle over the gun, it accidentally discharged, according to Dew, and the bullet struck his wife. Id. Dew said that he immediately had called for an ambulance and notified the sheriffs department of what had transpired. Id.
¶ 44. On appeal, this Court reversed Dew’s conviction and sentence, holding that the Weathersby rule applied to his case, that Dew’s testimony had not been “controverted in its material particulars by either the physical facts or those of common knowledge,” that the trial court had erred when it had not sustained Dew’s motion for a directed verdict, and this Court rendered judgment for Dew.
¶ 45. More recently, in Johnson, the accused had been visiting this state for the funeral of his grandmother when he and several other individuals were asked to help Johnson’s aunt move out of her apartment complex. Johnson, 987 So.2d at 428. While Johnson was helping his aunt move, Dennis Davis initiated several confrontations with Johnson prior to the altercation that resulted in Davis’s death. Id. Johnson testified that he and Davis’s girlfriend had been helping his aunt move out of her apartment, and that when they had finished packing the apartment’s contents, Johnson and Davis’s girlfriend had begun walking to a convenience store to purchase beer. Id. Johnson said that he did not feel comfortable walking to the convenience store in the dark following the events that had transpired with Davis throughout the day, so he decided to carry a knife with him. Id. Johnson said that, as he and Davis’s girlfriend were walking to the store, Davis came toward them quickly and struck the woman in the face with a dark object. Id. Johnson said that he pled with Davis not to hit the woman again and then stepped between Davis and the woman. Id. At that time, the woman walked away from Johnson and Davis. Id. Johnson testified that Davis then had made a swinging motion toward him with a dark weapon in his hand. Id. In response, Johnson stabbed Davis one time. Id. at 424. The woman had fled a short distance away from Johnson and Davis and did not see the altercation. Id.
¶ 46. Following the stabbing, Johnson approached a nearby residence to ask the occupants to call 911, but he received no response from the occupants of that residence. Id. Johnson then went to his aunt’s apartment and called 911, seeking help for Davis. Id. Johnson was indicted for the murder of Davis. Id. Johnson was convicted of manslaughter and sentenced to serve twenty years in the custody of the Department of Corrections. Id. Johnson filed a post-trial motion for a new trial or a judgment of acquittal notwithstanding the verdict, which was denied. Id.
¶47. On appeal, this Court held that “Johnson’s reasonable eyewitness account, not substantially contradicted in material particulars, coupled with the pertinent circumstances which corroborated it ..., collectively sustain a sufficient case of self-defense.” Id. at 426 (citing Weathersby, 147 So. at 482). Accordingly, Johnson’s *979 version of events was required to be accepted as true, and it provided an absolute legal defense to either murder or manslaughter. Id. (citing Weathersby, 147 So. at 482; Green, 681 So.2d at 174). Further, having taken “the transcript of the evidence by the four corners, ... the Weathersby rule is clearly applicable, as the necessary elements for either a murder or manslaughter conviction were lacking.... Johnson was entitled to a directed verdict of acquittal.” Id. (citing Houston v. State, 117 Miss. 311, 78 So. 182, 183 (1918); Blanks, 547 So.2d at 38).
¶ 48. Chad Booker, like Dew and Johnson, was the only living witness to the homicide in question. In addition to Booker’s testimony, numerous witnesses testified about Booker’s demeanor from March 10 to March 12, 2007, and other witnesses testified that Booker had a good reputation for veracity and peacefulness within the community.
¶ 49. Tyler Medlin, Booker’s passenger in the Ford Mustang on March 10, 2007, testified that Booker was calm throughout the earlier exchange between David White and Booker on that day, and that Booker had not threatened White, that he had not raised his voice to White, and that he had told White to call the law if there was a problem with his rate of speed.
¶ 50. Rickey Thrasher, the manager of the Discount Auto Parts store in Ripley, Mississippi, testified that Booker had come into the store on March 12, 2007, at approximately 4:30 p.m., to talk about a paint problem on a 1960s model Ford pickup truck. Thrasher said that their conversation had drifted from Booker’s paint problem to a general conversation about “how you get along with folks.” Thrasher said that he and Booker had begun to talk about a neighbor of Booker’s who had flagged Booker down over the weekend because the neighbor had thought he was traveling too fast and that the vehicle was too loud. Booker never told Thrasher that the neighbor of whom he spoke was David WTiite. Thrasher said that Booker had maintained a pleasant demeanor during their conversation, and that Booker never appeared upset and never spoke ill of the neighbor. Thrasher further testified that he had known Booker approximately twenty years, and that Booker was an honest man and a good customer. Thrasher also testified that Booker had a good reputation for telling the truth and that he had never heard anyone speak negatively of Booker.
¶ 51. After leaving the auto parts store, Booker went across the street to Southern Discount Motors to see Phillip Nance. Booker testified that he and Nance were friends and that he looked up to Nance. Booker said that he had expressed to Nance that he did not understand why WTiite had become so upset about him on Saturday. Nance gave a statement to Officer John Hillhouse on May 3, 2007. Pri- or to trial, Nance died. At trial, Officer Hillhouse read Nance’s statement into the record. In his statement, Nance said that Booker had come over to show him the orange paint job on the Ford pickup truck, and that he and Booker had talked about the truck and the superb paint jobs Booker was capable of producing. Nance said that as Booker was leaving, he mentioned that White had flagged him down and reprimanded him for driving too fast, and that Booker was puzzled about why White would have been so upset about his driving. Nance said that Booker made no comments about getting even with White, and he never threatened to harm White.
¶ 52. Booker testified that after he left Nance’s used-automobile dealership on March 12, 2007, he drove the orange Ford pickup truck to his home, parked it under his carport, then drove his red Chevrolet *980 Z-71 pickup truck from his house to his shop. Booker said that, after he had parked his Chevrolet pickup truck at his shop, he went to his blue Nissan “garbage truck” that was parked just outside the gate to his shop. Booker said that he had begun picking up garbage and putting it into the back of the Nissan truck. While Booker was picking up garbage, he saw David and Keith White driving on County Road 813. When he saw the Whites approaching, he said he “spoke,” meaning that he had waved his hand in the air as the Whites’ vehicle approached him. Booker said that Keith White spoke back by waving his hand as they drove past Booker. Keith testified that both he and his father had spoken to Booker as they had driven past him on County Road 813.
¶53. Booker said that, soon after the Whites had passed him on County Road 813, he had seen White “coming in real fast in his Yamaha Rhino,” and that he had been confused about why White was coming onto his property. Booker said that White parked the Rhino near the Nissan truck, turned the Rhino off, got out of the Rhino, and said “Hey, I got [to] talk to you.” Booker responded by saying “Mr. White, I don’t want any problems with you. Just leave. Leave my property. I don’t want any problems with you.” White said, “[h]ell naw. You’re going to talk to me.” Booker said that “[White] reached up to grab my collar, and when he did, he went to punch me with his other hand; and I caught his wrist and twisted it ... and I punched him three times and turned him loose.” Booker said that “I turned him loose and he stumbled and I remember him standing on his feet and going to his Rhino to get back on it, and I turned around and I started walking down the road because I got scared and wondered what was fixing to happen next. I was upset.” Booker said that he had not tried to hurt White; rather, he had been trying to defend himself. Once Booker had learned of White’s injuries, he voluntarily turned himself in to Tippah County sheriffs deputies.
¶ 54. Booker and White were the only people present at the time of the altercation. No other trial witness was able to testify regarding the events that had occurred outside Booker’s shop on the evening of March 12, 2007. Additionally, Booker and White exhibited injuries that were consistent with Booker’s testimony. Specifically, Booker’s hand had become swollen and was beginning to bruise at the time he gave his statement, and White had an injury on his right hand that was consistent with his having punched someone. Moreover, the State offered the testimony of Dr. Steven Hayne, a pathologist, to support its theory of the case; however, the witness admitted that Booker’s version of events could not be excluded, and in fact was a “distinct possibility.” The following exchange took place between the State and Dr. Hayne:
State: Based on your observation of Mr. White, would you expect that a person in a standing position who received this amount of force to the head could remain standing when receiving that lick?
Hayne: It would be unlikely ... unless he was supported by some means. If there’s more than one blow, then I would expect the person to fall unless supported.
However, the following exchange occurred between defense counsel and Dr. Hayne on cross-examination:
Defense: ... [M]y question to you is this: If we have testimony that Mr. White got out of his vehicle and accosted the defendant, grabbed him and swung at the defendant, and the defendant caught his hand, the swing *981 by Mr. White, and he grabbed Mr. White and pulled him to him and hit him three times and released him, and that Mr. White did not go down but Mr. White went back and got in his vehicle, you can’t contradict that that occurred, can you, if that’s what the proof shows?
Hayne: I cannot exclude that, Counsel- or, but again, I would not favor that scenario.
Defense: But you weren’t there, were you?
Hayne: No, sir.
Defense: Okay. And your medical findings don’t exclude that, do they?
Hayne: They do not, but they would lean strongly against it.
Defense: But you can’t swear under oath it didn’t happen, can you?
Hayne: No, I cannot do that.
Defense: And people who have had concussions have walked around before like in football, high school football, for instance?
Hayne: They have, but by definition, they’re going to have a momentary period of unconsciousness by definition.
Defense: And you believe in this particular case that Mr. White would have had a moment of unconsciousness?
Hayne: Yes, sir.
Defense: And then been conscious again?
Hayne: That’s a possibility, Counselor. He could have remained unconscious. That is certainly a distinct possibility.
Defense: But it’s also a distinct possibility he could have regained consciousness?
Hayne: That’s possible, Counselor, for a very short period of time.
Defense: Right. Regained lucidness, correct?
Hayne: I used the term lucid, yes.
Defense: Yes, sir. You found an injury on Mr. White?
Hayne: I found a bruise located on the back of the third finger of the right hand.
[[Image here]]
Defense: Would that be consistent -with throwing a blow?
Hayne: It would be consistent with it, Counselor.
Defense: And you believe that that injury occurred close in time?
Hayne: I would rule it at or about the time of death. Of course, there are other explanations for that injury too.
Defense: Sure. But you couldn’t exclude it as Mr. White throwing a punch, could you?
Hayne: I could not, sir.
¶ 55. At trial, Booker addressed the White family and apologized for what had happened to David White. However, Booker maintained that he had acted in self-defense and had not intended to hurt White. Further, Keith White and Charlotte White testified that they had never had problems, be it violence or otherwise, from their neighbor, Chad Booker. Moreover, numerous witnesses testified that Booker had not been angry or disrespectful to White prior to the altercation, and that Booker had not expressed any desire to retaliate against White for the events of Saturday, March 10, 2007.
¶ 56. The majority opined that the dispute between White and Booker on March 10, 2007, had not ended when Booker drove back to his auto shop after being accosted by White; rather, it carried on through the evening of March 10, 2007. Maj. Op. at ¶ 5. To support that opinion, the majority points to allegations of Keith White, David White’s son, to show that, after David White told Booker to slow down, Booker drove his red Chevrolet pickup truck on County Road 813 in front *982 of David White’s home approximately four times on the evening of March 10, 2007, and that each time Booker passed White’s home, he would stop at the end of White’s driveway, put the truck in neutral and rev the engine. Maj. Op. at ¶ 5. Keith White further testified that he heard Booker yell “f— you” on the fourth time that Booker drove past the White driveway. Maj. Op. at ¶ 5. Booker denied those allegations.
¶57. The majority also points to the testimony of Shade White, David White’s grandson, to illustrate that the dispute between David White and Booker had not ended when Booker went back to his shop after being confronted by David White on March 10, 2007. Maj. Op. at ¶ 5. Shade White testified that, near 11:00 p.m. on March 10, 2007, he heard the engine of a truck that he believed to be Booker’s revving up outside his bedroom window. However, defense counsel elicited testimony from Shade White to demonstrate that he, in fact, did not know whether the vehicle he had heard belonged to Booker, and he did not know whether Booker was driving the vehicle that he had heard that night.
¶ 58. Even if Shade White had maintained that the truck that he had heard outside his bedroom window on March 10, 2007, was Chad Booker’s and that Booker was actually driving the vehicle, Booker had an alibi and an alibi witness whose testimony contradicted that of Shade White. Booker’s alibi was that he was neither at home nor in the City of Ripley at the time of the alleged annoyance outside of Shade White’s bedroom window. Amy Estes testified that on March 10, 2007, she met Booker and Shanna Vuncan-non at 8:00 p.m. in the Wal-Mart parking lot in Ripley, Mississippi. Estes said that they left Ripley in Vuncannon’s vehicle and went to the Ruby Tuesday’s restaurant in Corinth, Mississippi. Estes further testified that she, Vuncannon, and Booker had left the Corinth restaurant at approximately 11:30 p.m., and that it was after 12:00 a.m. when they returned to Ripley.
¶59. Booker’s reasonable eyewitness account was “not substantially contradicted in material particulars,” and the “pertinent circumstances corroborate” his version of events, which would “collectively sustain a sufficient case of self-defense.” Johnson, 987 So.2d at 426. Therefore, Booker’s version of events was required to be accepted as true, and it provided an absolute legal defense, namely self defense, to either murder or manslaughter. Id. Moreover, having taken “the transcript of the evidence by the four corners, ... the Weathersby rule is clearly applicable, as the necessary elements for either a murder or manslaughter conviction were lacking.” Id. Accordingly, Booker was entitled to a directed verdict of acquittal. The judgment of the Court of Appeals and the trial court’s conviction and sentence should be reversed, and the case should be rendered in favor of Booker.
DICKINSON, P.J., AND CHANDLER, J., JOIN THIS OPINION.