# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-KA-01674-SCT

*MARY McQUARTERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/05/2009 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: ERIN ELIZABETH PRIDGEN |
| | LESLIE S. LEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/30/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.

### RANDOLPH, JUSTICE, FOR THE COURT:

¶1.     Mary McQuarters called 911 after discovering her boyfriend, Pete Jackson, dead in their bedroom with a deep cut on his wrist, a gash on the top of his head, and a small cut on his left eyebrow. When police arrived on the scene, and in a subsequent police statement later that evening, McQuarters in no way implicated herself in the incident. She suggested that one of Jackson's close friends may have been responsible. Only in subsequent police statements did McQuarters disclose that she and Jackson had engaged in a violent domestic dispute the night before she discovered his body, and that in self-defense she had cut his

forearm and thrown multiple glass objects at him. The coroner and forensic pathologist both concluded that Jackson died from blood loss resulting from a stab wound to his forearm.

¶2. McQuarters was indicted for the murder of Jackson. At trial, the Circuit Court of Adams County, Mississippi, granted McQuarters a directed verdict of acquittal on the murder charge, but allowed the case to proceed on the lesser offense of manslaughter. A jury found McQuarters guilty of manslaughter. The circuit court sentenced her to twenty years in the custody of the Mississippi Department of Corrections (MDOC), with fifteen years to serve and the remaining five years suspended, to be served on formal, reporting, post-release supervision. Following the denial of her "Motion for a New Trial," McQuarters filed a "Notice of Appeal." On appeal, McQuarters contends that the circuit court should have applied the *Weathersby*[1] rule and granted her a directed verdict of acquittal on the manslaughter charge.

**FACTS**

¶3. McQuarters and Jackson lived together, on and off, for fourteen years. On September 28, 2007, the couple had just resumed living together. McQuarters testified[2] that Jackson had arrived home with dinner that evening at around 9:00 or 9:30 p.m. Before they began eating, Jackson's friend, Kevin Buchanan, arrived and "asked [Jackson] did he want to go to work the next morning with him and another friend[,] . . . Clarence Brown . . . ." After Buchanan

---

[1]*See **Weathersby v. State**, 165 Miss. 207, 147 So. 481 (1933).

[2]The testimony and attending direct quotes referenced in ¶¶ 3-8 *infra*, are from McQuarters's trial testimony.

2

had left, McQuarters and Jackson began arguing because "in the past, [Brown] had always caused a lot of problems [because] he was a drug dealer and [was] always taking all of [Jackson's] money." Jackson then "got angry, and . . . asked me to stay out of his business," at which point she told him that he could move back out "if you're not going to change your lifestyle and respect some of my opinions . . . ."

¶4.　　At that point, Jackson "took a big glass coffee table and pushed it . . . on top of my foot[,]" shattering the glass. After removing her foot from her shoe, McQuarters attempted to leave through the front door, but Jackson "took the big floor mount television and pushed it over to prevent me from leaving . . . ." McQuarters then began running down the hall, but slipped and fell, and Jackson:

> grabbed me and *started choking me around my neck*, and I was asking him to please let me go, but he wouldn't and I started getting dizzy, gasping for breath. So I reached over and . . . *grabbed a piece of glass . . . with my left hand and stuck . . . him with it*,[3] but he still didn't remove his hand.

(Emphasis added.) Jackson released McQuarters's neck only when she bit his hand. She then continued to attempt to run down the hall, but Jackson grabbed her leg, stating, "I will kill you, low down black b****, if you don't stay out of my business."[4] After McQuarters

---

[3]McQuarters testified that "I was just trying to save my own life because [Jackson] was real different that night. He was not his usual self – [it] was not our usual fight."

[4]Brandy Bernard, the tenant of the duplex adjoining McQuarters's home, told police officers that she heard "loud noises," "fussing," and "the walls kind of bumping" at approximately 9:17 p.m. Bernard testified that the noise continued for "maybe twenty, thirty minutes." During that time, Bernard stated that the "[o]nly thing I heard was [Jackson], I heard him say, 'B****, I'll kill you,' or something like that." According to Detective Jerry Ford of the Natchez Police Department, Bernard told him that "she heard [Jackson] cursing

3

began kicking Jackson, he released her and fell against the wall, then "next thing I knew we were both standing in the kitchen . . . and he . . . showed me his arm and he said, 'Look, what you did.'" At that time, Jackson was not bleeding profusely, "[j]ust dripping[,]" and when McQuarters asked if he needed medical attention he replied that "it will be all right."

¶5. According to McQuarters, "normally when we fight one of us leaves. . . . So [Jackson] asked me . . . can I just go ahead on and catch some fresh air and cool off and come back later." She agreed, and as she was changing clothes, her nephew, Patrick Conner, arrived.[5] McQuarters "told [Conner] that I did something bad. That . . . [Jackson] and I got into a big fight, and I think I cut him on the arm."[6] Before leaving, McQuarters informed Jackson that Conner's friend, Dietrich Johnson Singleton, was taking her into town and that Conner was going to stay at home with him.[7] Upon leaving, Jackson "was sitting on the couch . . . with the wash cloth . . . on his hands[,]" and "said he would be okay . . . ."

_____

saying, 'You mother****er.' [Bernard] stated she heard furniture turning over and tumbling as though someone was in a struggle." Bernard testified further that she had heard a second altercation at McQuarters's home around 11:47 p.m.

[5]Conner had been living at McQuarters's home for approximately one month.

[6]In Conner's first police statement, he made no mention of McQuarters discussing her altercation with Jackson. In his second police statement, according to Detective Ford, Conner provided that McQuarters "told him she did something real bad. Then she stated she cut [Jackson's] wrist and hit him in the head."

[7]By contrast, according to Detective Ford, Conner's statements to police provided that McQuarters "told him don't help [Jackson], and she left." According to those statements, when Conner asked Jackson if he needed help, Jackson told him that he would be all right and asked him to leave. Conner then went to spend the night at another aunt's home.

¶6.     Singleton dropped McQuarters off at a local restaurant, Taste of Chicago, at 10:40 p.m.  McQuarters then stayed up all night talking with friends and drinking beer.  At approximately 5:00 a.m. on September 29, 2007, McQuarters called Conner "[t]o ask him how [Jackson] was and to come pick me up. [Conner] said he had to get up and go to work.  He didn't have time to pick me up."  That afternoon, McQuarters arrived at the Lunch Box restaurant and arranged to receive a ride home from employee Cathy Allen.  Allen testified that, following her shift, she drove McQuarters home and "we didn't discuss anything, but [McQuarters] was very upset, and she would not tell me what was wrong with her . . . . She was crying."[8]  According to Allen, she dropped McQuarters off around 4:15 or 4:20 p.m.

¶7.     Upon arriving home, McQuarters "went straight to the sink and washed [some] fish, and [Conner] came in behind me, and he was telling me that he was sorry about something.  So I told him I will talk to him . . . after I cooked."  But several minutes later, McQuarters started to "wonder what he's sorry about.  So I went back outside to ask him where was [Jackson], and [Conner] told me he was in the house."  Shortly thereafter, McQuarters discovered Jackson on his knees at the foot of their bed, unresponsive.  According to Conner's third police statement, McQuarters then came outside and stated that "somebody killed" Jackson.

¶8.     When police arrived on the scene, Bernard testified that McQuarters "stepped into my apartment . . . and she just said that someone had killed [Jackson]."  When Bernard "asked

---

[8]McQuarters denied being upset and crying.

what had happened," she testified that McQuarters "was like . . . she didn't do anything to him. They . . . have got in a fight and . . . she only cut him on the wrist or something . . . ." McQuarters admitted that when she spoke with police officers on the scene, she did not mention her prior altercation with Jackson. According to Officer Danny Barber of the Natchez Police Department, McQuarters:

> told me that she had just gotten in, and she went in the house and observed blood all over the house, and she walked through the house, and that's when she found [Jackson] in the bedroom, and he appeared to be deceased. That someone had possibly hit him in the head . . . .

Officer Barber added that McQuarters in no way had implicated herself in the incident. Detective Ford testified that "from what I had been told, [McQuarters] said someone had broke in her apartment and killed her boyfriend." McQuarters further acknowledged that she had indicated to the police officers that Jackson's close friend, Edward Palmer, needed to be considered as a suspect. According to Detective Ford, when he "asked [McQuarters] if she knew [who] may have done that, . . . she said that the only person she could recall is maybe [Palmer] because of [Jackson] and [Palmer] having some type of argument over some money or something of that nature."

¶9. Multiple witnesses testified that a subsequent investigation of McQuarters's home revealed general disarray, with large amounts of blood in the kitchen,[9] hallway, and living

---

[9]Officer Barber testified that there were "huge puddles [of blood] on the kitchen floor, and there was one big towel on the floor that was completely soaked in blood."

room, in addition to the hallway walls.[10] The pool of blood in the living room contained broken glass, and there was also a broken glass coffee table; a broken lamp; three liquor bottles, one of which was covered in blood; a broken ceramic angel lying on the floor; an overturned television; and a broken remote control. When Officer Barber located Jackson, he was slumped over the foot of the bed with a deep cut on his wrist, a gash of approximately two inches on the top of his head,[11] a small cut on his left eyebrow, and "no pulse, . . . his body was cold."

¶10.    Both Lee and Dr. Steven Hayne, tendered and accepted as an expert in the field of forensic pathology, testified that Jackson had died from blood loss resulting from a stab wound to the left forearm, and ruled the death a homicide. According to Dr. Hayne, the wound "extend[ed] to a depth of approximately six inches, and the stabbing instrument went through major blood vessels including the left radial artery . . . ." Dr. Hayne's autopsy of Jackson also revealed "a concentration of ethyl alcohol . . . of 0.060 percent," and "a trace amount of cocaine."

---

[10]Adams County coroner James Lee described it as "a horrifying scene . . . ."

[11]Both Officer Barber and Detective Ford testified that Jackson's head appeared extremely clean, as if someone had wiped the blood off. Lee added that, "a person who had as much blood in the hallway that I have seen, this guy should have been covered with blood all over somewhere, but apparently he had been cleaned or something."

¶11.    McQuarters's first police statement, given at 10:00 p.m. on September 29, 2007, provided that Jackson had arrived home with food at 10:30 p.m. on September 28, 2007.[12] McQuarters stated that she did not eat "[b]ecause I wanted to go up to Taste of Chicago."[13] After getting a ride from Singleton, McQuarters "stayed up town all ni[ght] Friday up until . . . later Saturday evening." Upon receiving a ride home from Allen, McQuarters entered through the kitchen door and "started frying fish without even looking around." Soon thereafter, she began "feeling funny" and went outside to ask Conner if he had seen Jackson. According to McQuarters:

> [b]ecause he said to me that he was on the sofa [a]sleep when I talked with [Conner] from Taste of Chicago around 5:00 [a.m.,] I went in [and] . . . saw all of the blood on the kitchen floor. . . . Then I entered the bed[room] [and] found [Jackson] on his knees with a big gash on the back of his head.[14]

McQuarters then called 911. At trial, McQuarters admitted that, in her first police statement, she had not mentioned her altercation with Jackson, that Jackson had been choking her, or that she had cut Jackson on the forearm.

¶12.    McQuarters was arrested on September 30, 2007. Her second police statement, given at 1:00 p.m. that day, provided that on September 28, 2007:

> my fiancé [Jackson] and I got into a fight about money someone owed him. [Jackson] began to kick me on the leg and then hit me on the head with his fist. [Jackson] grabbed the glass coffee table and turn[ed] it over, breaking the

---

[12]At trial, McQuarters acknowledged that Jackson actually "came home around 9:00 or 9:30 . . . ."

[13]At trial, McQuarters admitted that this statement was untrue.

[14]At trial, McQuarters testified that this final quoted sentence was untrue.

8

glass. I picked up a piece of the glass with my left hand and cut [Jackson] on the arm. As I tried to go out . . . [Jackson] knocked the t.v. down and prevented me from leaving. . . . [Jackson] grabbed me by the leg and I started kicking asking him to let me go. After he turned me . . . loose[15] I went by the black stand, and grabbed everything that was breakable and I started throwing [it] at [Jackson]. I threw a Hypnotic [liquor] bottle and a ceramic angel . . . . [Jackson] was bleeding and I asked him if he wanted to go to the hospital and he said no because it's not that bad. I met [Conner] at the door. I told him that I had done something bad. . . . [Conner] . . . asked [Jackson] to go to the hospital, but [Jackson] told him ["]no["] that he'll be ok.

Thereafter, McQuarters got a ride from Singleton, "partied . . . until the next day[,]" returned home, and "started frying fish." At that point, she "thought it was strange to not hear [Jackson's] voice. So I went outside to talk to [Conner] but he was on the phone, so I went back inside . . . , that's when I noticed all of the blood over the floor." After discovering Jackson in the bedroom, she called 911.

¶13. McQuarters's third police statement, given on October 4, 2007, provided that after the altercation with Jackson, her clothing had been blood-stained, so she had placed her pants and shoes "in the gym sack in [Conner's] room[,]" and put her socks, shirt, and two towels in the washing machine. After changing clothes, McQuarters called Conner and "told him that I had did something . . . that I had cut [Jackson] on his arm but [Jackson] said that it wasn't that bad when I ask him if he wanted to go to the hospital." The statement concluded that when she had left for Taste of Chicago, Jackson "was sitting on the sofa with a towel on his arm." This third police statement did not mention Jackson choking McQuarters.

---

[15]In her second police statement, McQuarters admittedly made no mention of Jackson choking her.

9

¶14.   On October 2, 2008, McQuarters was indicted, along with Conner, under Mississippi Code Section 97-3-19 for "acting in concert, each with the other, [to] wilfully, unlawfully, feloniously and with malice aforethought, kill and murder [Jackson] . . . ."

¶15.   McQuarters's jury trial commenced on August 4, 2009.   After the State rested, McQuarters moved for a directed verdict of acquittal.   The circuit court found that McQuarters was entitled to a directed verdict, stating:

> [t]he State has chosen to proceed under an indictment with the language charging [McQuarters] with what's referred to as *deliberate design murder.* Malice aforethought murder.   That is the language of the indictment very clearly. . . . *It would appear to the [c]ourt that [depraved heart murder] would have been the proper charge . . . .*   The State has presented ample evidence which would give a prima facie case of a depraved heart murder. The problem is that [McQuarters] has not been put on notice of that.

(Emphasis added.)  But the circuit court added that:

> under Section 99-19-5,[16] clearly [McQuarters is] on notice as to *manslaughter* which is clearly a lesser included offense, and manslaughter is essentially the killing of a human being without malice in the heat of passion but in a cruel or unusual manner, . . . without authority of law and not in necessary self defense.  Very clearly, *the State has presented ample evidence in that regard.*

(Emphasis added.)  Thus, the case proceeded on the lesser offense of manslaughter.  After the State rested finally, McQuarters renewed her motion for directed verdict, which the circuit court denied.  The jury found McQuarters guilty of manslaughter, and the circuit court

---

[16]"For purposes of this section, manslaughter shall be considered a lesser included offense of murder . . . ."  Miss. Code Ann. § 99-19-5(2) (Rev. 2007).  *See also* Miss. Code Ann. § 97-3-19(3) (Rev. 2006) ("[a]n indictment for murder . . . shall serve as notice to the defendant that the indictment may include any and all lesser included offenses thereof, including . . . manslaughter.").

sentenced her to twenty years in the custody of the MDOC, with fifteen years to serve and the remaining five years suspended, to be served on formal, reporting, post-release supervision. Following the denial of her "Motion for a New Trial," McQuarters filed a "Notice of Appeal."

**ISSUE**

¶16. This Court will consider:

Whether the circuit court committed reversible error when it declined to apply the *Weathersby* rule and, therefore, grant McQuarters a directed verdict of acquittal on the manslaughter charge.

**ANALYSIS**

¶17. McQuarters contends that she "was the only eyewitness to the homicide[,] . . . testified that she injured [Jackson] in self-defense[,]" and that such testimony was not "substantially contradicted in material particulars" by her prior police statements. According to McQuarters, her police statements, "taken individually, only describe a particular point in time during the entire two-day span of Friday evening to Saturday evening. Each statement included more detail than the previous. Taken as a whole, the statements tell the entire sequence of events . . . ." As such, McQuarters argues that "[g]iven the uncontradicted statements and evidence of material facts presented at trial, the trial court erred in not apply[ing] *Weathersby* and in finding there was sufficient evidence to instruct the jury to consider manslaughter."

11

¶18. The State responds that McQuarters "is asking this Court to ignore all evidence, save for her account of the events in question and overturn the reasonable jury's verdict of guilty." According to the State:

> [t]o do this, th[is] Court would necessarily have to set aside her conflicting statements to police, her own testimony that portions of her statements were untrue, the physical evidence of the crime scene, the fact that she attempted to direct suspicion at another person for the crime, and well-settled case law that says that when there is conflicting evidence, the *Weathersby* rule does not apply.

Furthermore, the State poses the following question, "[e]ven if, for the sake of argument, all other evidence and testimony were to be ignored, which of [McQuarters's] versions is the one that should be accepted?"

¶19. This Court has stated that, "*Weathersby* . . . is nothing more than a particularized version of our general standards according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment of acquittal as a matter of law." *Johnson v. State*, 987 So. 2d 420, 425 (Miss. 2008) (quoting *Jackson v. State*, 551 So. 2d 132, 136 (Miss. 1989)). "When considering a motion for directed verdict, all evidence introduced by the State must be accepted as true, together with all reasonable inferences therefrom. If there is sufficient evidence to support a guilty verdict, the motion for directed verdict must be overruled." *Green v. State*, 631 So. 2d 167, 175 (Miss. 1994) (internal citations omitted).

¶20. "[W]e have long held that 'the jury has no right to disregard arbitrarily evidence that is uncontradicted and not unreasonable or improbable on its face.' . . . *Weathersby* is but an elaboration of this view." *Heidel v. State*, 587 So. 2d 835, 839 (Miss. 1991) (quoting

*Fortenberry v. State*, 216 Miss. 243, 251, 62 So. 2d 325, 327 (1953); *McLeod v. State*, 140 Miss. 897, 901, 105 So. 757 (1925)). *Weathersby* provides that:

> the established rule in this state [is] that where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Weathersby*, 147 So. at 482. *See also Blanks v. State*, 547 So. 2d 29, 33 (Miss. 1989) ("[w]here the defendant is the only eyewitness to a slaying, his version must be *reasonable and credible* before he is entitled to an acquittal under the [*Weathersby*] rule.") (emphasis added).

¶21. But "[i]t is a rare case that meets all of the requirements of the [*Weathersby*] rule." *Sartain v. State*, 311 So. 2d 343, 345 (Miss. 1975) (quoting *Murphy v. State*, 232 Miss. 424, 430, 99 So. 2d 595, 598 (1958)). *See also Fairley v. State*, 871 So. 2d 1282, 1284 (Miss. 2003) (quoting *Buchanan v. State*, 567 So. 2d 194, 196 (Miss. 1990)) ("[d]efendants have often cited and argued application of the *Weathersby* [r]ule, but seldom have they prevailed. Usually, a factual issue is presented which requires submission of the case to the jury."). Under *Weathersby*, differences in mere detail, not "controlling substance[,]" are permissible. *Weathersby*, 147 So. at 482. But this Court has stated further that the *Weathersby* rule is inapplicable "where the *defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial.*" *Green*, 631 So. 2d at 174 (citing *Blanks*, 547 So. 2d at 34) (emphasis added). *See also Fairley*, 871 So. 2d at 1284 ("[w]here conflicting stories are given about a homicide by the accused, the *Weathersby*

13

[r]ule does not apply . . . ."); *Blanks*, 547 So. 2d at 33 (citations omitted) (application of the *Weathersby* rule is precluded "where the accused, following the slaying, gives conflicting versions of how the killing took place, or initially denies the act.").

¶22.   This Court finds salient factual similarities between the case *sub judice* and *Sartain*. In *Sartain*:

> [t]he appellant[-wife], within a short while, related three versions of what had transpired: (1) that a man who tried to sell [the victim-husband] some whisky came in, an argument ensued and the man supposedly stabbed [the victim-husband] on the front steps; (2) that a woman down the street who had been trying to go with [the victim-husband] stabbed him; and (3) that a man dressed in black came into the room, jumped on the bed, started fighting with [the victim-husband], and as they wrestled from the bedroom to the front door, the man stabbed him.

*Sartain*, 311 So. 2d at 344.  Following her arrest based upon these conflicting versions, the appellant-wife was indicted and convicted for the murder of her husband.  *See id*. at 343-44. On appeal, the appellant-wife argued that her written statement given to police following her arrest provided "ample proof that the killing was justified in that she was acting in necessary self-defense; that it was done while she was repelling the [victim-husband's] attempt to commit a felony upon her; and, that under the *Weathersby* rule she was entitled to a directed verdict of acquittal."  *Id*. at 344.  This Court rejected that argument, concluding that:

> [u]nder these circumstances, and considering the fact that appellant[-wife] did not complain to the investigating officers of having been choked and beaten and that the [victim-husband] was attempting to commit an unnatural act upon her as alleged in her statement, we are of the opinion that the trial court was correct in not granting her the benefit of the *Weathersby* rule . . . .

*Id*. at 345.

14

¶23. This Court finds no error by the circuit judge in deeming the *Weathersby* rule inapplicable under the circumstances, as McQuarters's "conduct and statements following the killing" were undeniably "inconsistent with [her] version of the events as recounted at trial." *Green*, 631 So. 2d at 174. Most notably, at both the crime scene and in her first police statement, McQuarters made no mention of her altercation with Jackson or of cutting him on the forearm. Instead, McQuarters told police officers that someone possibly had hit Jackson on the head and suggested that Palmer should be considered a suspect. The circuit judge aptly stated at sentencing that "every action you took looked like it was to cover something up." Moreover, the aforementioned evidence, along with other evidence presented, calls into question the reasonableness and credibility of the version McQuarters recounted at trial. *See Blanks*, 547 So. 2d at 33. Such other evidence included the following: McQuarters never alleged that Jackson had choked her until trial;[17] her purported concern for Jackson following the altercation was disputed by Conner's police statements; she initially had failed to notice the abundant quantities of blood in her home, despite multiple witnesses testifying that the scene was alarming; and she had acknowledged that portions of her police statements were untrue. Considering all of the aforementioned evidence collectively, this Court concludes that the circuit court did not err in denying McQuarters's motion for directed verdict on the manslaughter charge. As such, it was "a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either convict or acquit." *Id*. at

---

[17]Additionally, photographs taken of McQuarters on October 1, 2007, reveal that while McQuarters did have some bruises on her body, no choke marks were visible.

33-34 (citations omitted). *See also* **Burrell v. State**, 613 So. 2d 1186, 1192 (quoting **Byrd v. State**, 522 So. 2d 756, 760 (Miss. 1988)) ("[t]he jury is the sole judge of the weight and credibility of the evidence.").

## CONCLUSION

¶24.    Based upon the aforementioned analysis, this Court affirms McQuarters's conviction and the attending sentence imposed by the Circuit Court of Adams County.

¶25.    **CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIFTEEN (15) YEARS TO SERVE AND FIVE (5) YEARS ON FORMAL REPORTING POST-RELEASE SUPERVISION, WITH CONDITIONS, AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**

16