# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01044-COA

**TIMOTHY OWENS A/K/A TIMOTHY OWENS JR.**        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/07/2017 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/04/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., CARLTON AND FAIR, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. Timothy Owens was convicted of first-degree murder and sentenced to life in prison. Owens now appeals his conviction and sentence, arguing the following assignments of error: (1) the evidence was insufficient to support the conviction; (2) Owens was prejudiced by ineffective assistance of counsel; and (3) comments made by the State during closing arguments constituted prosecutorial misconduct, thus rendering Owens's trial unfair.

¶2. After reviewing the record, we find no error, and we affirm the trial court's judgment.

**FACTS**

¶3.     On May 27, 2015, police officers from the Jackson Police Department responded to a call about a shooting on Cox Street. When the officers arrived, they discovered the deceased body of Ruth Williams. After an investigation, officers arrested Owens, who was in a romantic relationship with Ruth and living with her at the time of the shooting, and charged him with Ruth's murder.

¶4.     Marcus Williams, Ruth's son, testified that at the time of the shooting, he was living with his mother and Owens. Marcus testified that his mother and Owens had been friends for years before their relationship became intimate. Marcus testified that on the evening of May 27, 2015, he arrived home from work and went next door to do laundry. Marcus testified that during this time, both Ruth and Owens were home. Marcus said that when he returned home from doing laundry, Ruth asked him to bring her a glass of water. Marcus testified that he brought a glass of water to Ruth, who was sitting in a recliner in her bedroom. Marcus stated that Owens was also in the bedroom, lying on the bed. Marcus testified that when he walked out of the bedroom, he looked out of the corner of his eye and saw Owens get out off of the bed and close the bedroom door. Marcus then heard Owens call Ruth a "bitch." Ruth responded "I ain't no bitch. The bitch who brought you here is down the street," referring to Owens's mother.

¶5.     Marcus stated that after exiting the bedroom, he walked past the bathroom and toward the kitchen. Marcus stated that as he passed the bathroom, he heard gunshots. Marcus called out to Ruth, and he heard Ruth call out his name in response.[1] Marcus then went to the

_____

[1] When asked specifically at what point Ruth called out his name, Marcus answered "I think it was between the time between the shooting or after the time I can't recall it,

2

bedroom, kicked the door in, and saw Ruth on the floor by the recliner near the foot of the bed. Marcus testified that he could see "the blood running from the top of her body." According to Marcus, Owens was still sitting on the bed, but he got up and pointed a gun at Marcus once Marcus entered the bedroom. Marcus testified that he took off running and called 911. Marcus stated that after he called 911, he walked to Owens's mother's house, who lived approximately three houses away, and "let her know that her son shot my mother." At trial, Marcus testified that Owens "shot my momma five times."

¶6.     Marcus stated that after he spoke to Owens's mother, Owens's family ran to Marcus's house. Marcus explained that they had to wait approximately 45 minutes for an ambulance, and during that time, Owens was still inside of the house. Marcus testified that Owens's family members were trying to calm Owens down because Owens was pointing a gun at Marcus and Kiesha Owens, Owens's sister.

¶7.     Kiesha testified that in May 2015, she lived three houses down from Owens and Ruth on Cox Street. Kiesha stated that on the evening of May 27, 2015, Kiesha's niece came into the house and said "there was a shooting down the street at [Owens's] house." Kiesha said that at first she ignored her niece, but then when her niece repeated that "they [are] shooting" at Owens's house, Kiesha ran down to Owens's house.

¶8.     Kiesha testified that when she arrived at Owens's house, Marcus's brother, Rufus, and another man who was holding a gun, were standing at the door. Kiesha entered the house, where she saw Marcus and her nephew, Tiny, running out of the bathroom. Marcus then

---

because when I came in, she was already on the ground[.]"

3

stood in the living room. Kiesha testified that the bedroom door was locked, so she knocked on the door and called out to Owens: "[T]his is your sister, Kiesha; let me in." Owens eventually opened the door, and then he went back to the bed and held a gun to his head. According to Kiesha, Owens did not look like himself, and Owens asked her to just let him kill himself. Kiesha stated that saw Ruth on the floor. Kiesha testified that she checked Ruth's pulse and felt a light pulse. Kiesha asked Owens to let her get help for Ruth. Kiesha also testified that "in the midst of me talking to him and checking on . . . Ruth[,] I hear people in the background yelling please do not shoot. Please do not shoot." Kiesha asked Owens to put the gun down, and Owens "proceeded to put the gun down on the bed[.]" Kiesha asked Owens what happened, and he responded that Ruth "told [him] that she was going to f*ck somebody." Kiesha grabbed the gun off of the bed and ran out of the house. Kiesha stated that she handed the gun to a police officer who was standing across the street from Owens's house.

¶9. Detective Richard Washington of the Jackson Police Department testified that on the evening of May 27, 2015, he responded to a call about a shooting on Cox Street. Detective Washington testified that once he arrived at Owens's house, other police officers had already secured the scene. Detective Washington entered the house and walked into the bedroom, where he observed Ruth on the bedroom floor, deceased. Detective Washington stated that police officers retrieved a gun from the scene, and the officers determined that the gun belonged to Owens.

¶10. Officer Robert Watts worked as a crime-scene investigator for the Jackson Police

Department in May 2015. Officer Watts testified that on May 27, 2015, he photographed the crime scene on Cox Street. Officer Watts stated that the weapon recovered from the scene was a Taurus .38 special revolver that could hold five rounds. Officer Watts testified that when the gun was examined, it was determined to contain four live rounds and one spent shell casing. Officer Watts explained that "[a] live round is a bullet that has not been fired, and a spent shell casing is a bullet that has been fired." Officer Watts also testified that a bullet was recovered from under Ruth's body.

¶11. Dr. Brent Davis, a medical examiner and forensic pathologist at the Mississippi State Medical Examiner's office, testified as an expert in the field of forensic pathology. Dr. Davis testified that he performed Ruth's autopsy, and he observed that she was shot five times, including two times in her abdomen.[2] Dr. Davis testified that he recovered three bullets from Ruth's body during his examination. The three bullets were admitted into evidence. After performing the autopsy, Dr. Davis opined that Ruth's cause of death was "multiple gunshot wounds, and the manner of death is homicide."

¶12. After the State rested, defense counsel acknowledged that "typically this is the portion of the trial where the defense will make a motion for a directive verdict because the State has rested." However, defense counsel requested that the trial court allow the defense "to reserve that motion until after the defense has been heard this time only because at this point I would have to make the same argument again twice, and if the Court has no objection, I just prefer to just do it once and make that argument at the close of the defense case[.]" The trial court

_____

[2] Dr. Davis testified that Ruth had six gunshot wounds; one bullet struck her, went through her, and entered her body a second time.

5

granted the defense's request.

¶13.　　Owens testified in his own defense, stating that on May 27, 2015, he and Ruth got into an argument that lasted all day. Owens testified that Ruth became angry when Owens was unable to drive Marcus to work that morning. Owens stated that at one point during the evening, he and Ruth were arguing in the bedroom. During that time, Ruth received a phone call, so she left the bedroom. Owens testified that he was upset that Ruth left the room to answer the phone and that she would not take the phone call in front of him. After Ruth got off the phone, she returned to the bedroom. Owens testified that when Ruth returned to the bedroom, he asked her about the phone call. According to Owens, Ruth told him that she had been on the phone with another man. Ruth then told Owens that she could do whatever she wanted to do, she could have sexual relationships with whomever she wanted to, and she could do it in front of Owens. Owens responded "That's the way that bitches act." Owens testified that Ruth told him "this is the last time that you going to ever call me a bitch. I'm the last person you ever going to see. . . . [A]s soon as my two sons get here[,] you'll find out." Owens stated that Ruth then called Marcus into the bedroom. Owens testified that Marcus "enter[ed] the room for just a second, went out, and closed t[he] door."

¶14.　　Owens testified that as soon as Marcus left the room, Ruth jumped up and reached for the .38 revolver. Owens then "lunged" toward her, and he ended up with the gun. Owens testified that he heard the gun go off and fire "maybe" twice, but he did not know that Ruth was shot. Owens saw Ruth step back and fall down. Owens testified that "[a]t that point I completely just froze" and had no memory of anything else until Kiesha knocked on the

6

bedroom door. Owens did recall holding a gun to his head and observing Kiesha asking him if she could help Ruth.

¶15. Owens testified that when the police arrived, he was still in a state of shock. During cross-examination, he admitted that when the detectives interviewed him, Owens stated that "[he] knew [he] had effed up." Owens also admitted at trial that during his police interview on May 27, 2015, after the shooting, he did not tell the detectives his version of the events regarding Ruth jumping up and lunging for the gun. As to the omission, Owens explained that he was in a state of shock. Owens admitted to shooting Ruth, but he claimed that "I had no intent on shooting Ms. Ruth or harming Ms. Ruth. I loved her. It was an accident."

¶16. After Owens's testimony, the defense rested. The State then called Marcus on rebuttal and asked Marcus whether, prior to his arriving home after work, Ruth called him to return home at any point. Marcus responded "No."

¶17. Defense counsel then moved for a directed verdict pursuant to *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933). Defense counsel argued "that if the defendant is the only eyewitness to the homicide[, his] version, if reasonable, must be accepted as true unless substantially contradicted by a creditable witness or witnesses for the State." Defense counsel explained that no other witness refuted Owens's testimony that he and Ruth were arguing. Defense counsel also stated that Owens admitted that he shot Ruth but that the gun accidentally went off as he and Ruth were both reaching for it. The State argued Marcus testified that he heard Ruth and Owens arguing, that Marcus saw Owens get off of the bed and shut the bedroom door, and that Marcus heard Ruth call out to him in distress. The trial

7

court denied the defense's motion for a directed verdict, explaining that "the facts of this case would not allow the [c]ourt to apply *Weathersby* herein, and the [c]ourt finds that *Weathersby* rule is not applicable herein and will refuse it."

¶18. The jury returned a verdict finding Owens guilty of first-degree murder, and the trial court sentenced Owens to life in prison. Owens failed to file any posttrial motions. After the trial court granted Owens's motion for leave to file an out-of-time appeal, Owens appealed his conviction and sentence.

## DISCUSSION

### I. Sufficiency of the Evidence

¶19. Owens argues that the evidence presented at trial was insufficient to support his conviction of deliberate design first-degree murder. Owens acknowledges that he failed to file any posttrial motions, but he asserts that because his counsel moved for a directed verdict, the issue of the sufficiency of the evidence is preserved.[3]

¶20. Owens first maintains that since there were no eye witnesses to the shooting in this case, and since Owens's testimony was reasonable and consistent with Marcus's testimony and the physical evidence, he was entitled to a directed verdict of acquittal on the first-degree

---

[3] "When the defendant proceeds with his case after the state rests and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of that directed verdict. In the absence of a renewal of the directed verdict, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict, the defendant has waived the sufficiency error on appeal." *Pace v. State*, 242 So. 3d 107, 117 (¶25) (Miss. 2018) (quoting *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995) (citation and internal quotation marks omitted)). As stated, after the State rested, the trial court granted the defense counsel's request to make her motion for a directed verdict at the close of all of the evidence. Once the defense rested, the defense counsel proceeded to make her argument that Owens was entitled to receive a directed verdict.

murder charge on the principles set forth by the Mississippi Supreme Court in *Weathersby*, 165 Miss. at 209, 147 So. at 482. Owens further asserts in his brief that "the evidence was only sufficient for a second[-]degree murder conviction or a manslaughter conviction if the jury found that the homicide was not committed in justifiable self defense or that it did not result from an accident."

¶21.    In *Weathersby*, the Mississippi Supreme Court established the following rule:

> where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

*Id.*

¶22.    The supreme court has since clarified that "*Weathersby* is nothing more than a particularized version of our general standards according to which courts must decide whether in a criminal prosecution the accused is entitled to a judgment of acquittal as a matter of law." *McQuarters v. State*, 45 So. 3d 643, 650 (¶19) (Miss. 2010) (quoting *Johnson v. State*, 987 So. 2d 420, 425 (¶10) (Miss. 2008)). We recognize that "[w]hen considering a motion for directed verdict, all evidence introduced by the State must be accepted as true, together with all reasonable inferences therefrom. If there is sufficient evidence to support a guilty verdict, the motion for directed verdict must be overruled." *Id*.

¶23.    The supreme court has acknowledged that "it is a rare case that meets all of the requirements of the *Weathersby* rule." *McQuarters*, 45 So. 3d at 650 (¶21) (quoting *Sartain v. State*, 311 So. 2d 343, 345 (Miss. 1975)). "Under *Weathersby*, differences in mere detail,

not controlling substance, are permissible." *Id.* (internal quotation marks omitted). The supreme court has held that "the *Weathersby* rule is inapplicable where the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *McQuarters*, 45 So. 3d at 650 (¶21) (internal quotation mark omitted). Furthermore, "*Weathersby* does not automatically apply when the defendant is the only eyewitness. Rather, the Court has held that *Weathersby* has no application where the defendant's version is patently unreasonable, or contradicted by physical facts." *Jones v. State*, 154 So. 3d 872, 878 (¶17) (Miss. 2014) (internal quotation mark omitted).

¶24. In the present case, Owens testified that the gun went off two times by accident; however, the physical evidence showed that Ruth was shot five times. Owens testified that after Marcus entered the bedroom prior to the shooting, Marcus closed the door as he left; however Marcus testified that he observed Owens get off of the bed and close the bedroom door. Owens also testified that the gun only went off twice; however, Dr. Davis testified that Ruth suffered five gunshots, and he was able to recover three of the bullets from Ruth's body. Officer Watts also testified that officers discovered a bullet under Ruth's body.

¶25. Owens also argues that the evidence presented at trial was insufficient to properly show the "deliberate design" required for first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2014). In support of his argument, Owens cites to *Wilson v. State*, 936 So. 2d 357, 364 (¶17) (Miss. 2006), where the supreme court explained that:

> deliberate design connotes an intent to kill. . . . [And] deliberate indicates a full awareness of what one is doing and generally implies careful and unhurried

consideration of the consequences. Design means to calculate, plan or contemplate. However, deliberate design to kill a person may be formed quickly and perhaps only moments before the act.

*Id.* (citations omitted).

¶26.    This Court reviews de novo challenges to the sufficiency of the evidence. *Johnson v. State*, 235 So. 3d 1404, 1410 (¶12) (Miss. 2017).  In so doing, "we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation mark omitted) (quoting *Brooks v. State*, 203 So. 3d 1134 (¶11) (Miss. 2016)).  "Where the facts and inferences point in favor of the defendant on any element of the offense with sufficient force that reasonable jurors could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is to reverse and render." *Jackson v. State*, 247 So. 3d 335, 337 (¶6) (Miss. Ct. App. 2018) (internal quotation marks omitted).  Evidence will be deemed sufficient if "reasonable fair-minded jurors in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient." *Id*.  The State receives "the benefit of all reasonable inferences that may be drawn from the evidence." *Johnson*, 235 So. 3d at 1410 (¶12) (internal quotation marks omitted).

¶27.    After our review, we find that the evidence, as set forth above, is sufficient to support a finding that a rational, hypothetical juror could have found each of the elements of deliberate design murder beyond a reasonable doubt. *Id*.  This issue lacks merit.

**II.    Ineffective Assistance of Counsel**

11

¶28. Owens asserts that his trial counsel was ineffective, and he argues that his counsel's deficiencies interfered with his right to due process and resulted in Owens's failure to receive a fair trial. Owens claims the following constitute deficiencies by his trial counsel: (1) failing to request a culpable negligence manslaughter instruction; (2) failing to request an imperfect self-defense manslaughter instruction; (3) offering an incomplete self-defense instruction; (4) failing to file a posttrial motion for a JNOV; and (5) failing to file a posttrial motion for new trial.

¶29. The supreme court has held that "[o]rdinarily, claims of ineffective assistance of counsel are not addressed on direct appeal." *Pace v. State*, 242 So. 3d 107, 118 (¶28) (Miss. 2018). The supreme court reasoned that "there is usually insufficient evidence within the record to evaluate the claim." *Id*. (quoting *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003)). This Court can address the merits of an ineffective-assistance of counsel claim on direct appeal "only in instances where '(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.'" *Collins v. State*, 221 So. 3d 366, 372 (¶19) (Miss. Ct. App. 2016) (quoting *Wilcher*, 863 So. 2d at 825 (¶171)). Additionally, "if the defendant is represented by counsel who did not represent him at trial, and the facts supporting the claim are fully apparent from the appellate record, the [appellate] [c]ourt may address the issue." *Pace*, 242 So. 3d at 118 (¶28) (citing M.R.A.P. 22(b)).

¶30. In the present case, although the State addressed Owens's claim of ineffective

12

assistance of counsel, the State failed to stipulate that the record before us is adequate to allow this Court to dispose of Owens's claim. Additionally, we do not find the record affirmatively shows ineffectiveness of constitutional dimensions. "Where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." *Pace*, 242 So. 3d at 118 (¶28). Therefore, we dismiss Owens's ineffective-assistance-of-counsel claim without prejudice, so he may pursue the claim in a properly filed motion for post-conviction relief. *See* Miss. Code Ann. § 99-39-7 (Rev. 2015).

### III.     Prosecutorial Misconduct

¶31.    Owens next argues that he was denied a fair trial due to improper comments made by the prosecutor during closing arguments. Owens asserts that these comments were "an impermissible direct negative comment on Owens' constitutional right to stand trial." Owens claims that the comments violated his right to stand trial and sought to inflame the jury's emotions to make the jury feel sorry for Owens's family in order to make the jury punish Owens.

¶32.    The record reflects that during closing argument, the prosecutor commented that Owens "forced his family to go through this trial." The transcript shows the following exchange occurred:

[Defense Counsel]:  Objection, Your Honor.

THE COURT:        Let me see where you're going.  What's the comment?

| [Prosecutor]: | He offered, he chose to go to trial. |
| THE COURT: | Well, sustained with that statement alone. |
| [Prosecutor]: | He forced his family to go through this trial. |
| [Defense Counsel]: | Objection, Your Honor. |
| THE COURT: | It's sustained. It's sustained. Let's rephrase. |

¶33. After the jury retired to deliberate, defense counsel asked for a mistrial based on the inflammatory argument, but the trial court denied the motion, finding that Owens was not prejudiced by the comments.

¶34. When reviewing a defendant's claim of prosecutorial misconduct during closing arguments, this Court must examine "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Jackson v. State*, 174 So. 3d 232, 236 (¶9) (Miss. 2015). We recognize that "[a]ttorneys are to be given wide latitude in making their closing arguments." *Evans v. State*, 226 So. 3d 1, 31 (¶79) (Miss. 2017).

¶35. In *Bolton v. State*, 113 So. 3d 573, 578 (¶13) (Miss. Ct. App. 2012), *rev'd on other grounds in Bolton v. State*, 113 So. 3d 542 (Miss. 2013), this Court held that the prosecutor's comments were improper where, during opening statements, the prosecutor told the jury "I know that it's possible that you all are thinking that since there's all this evidence, why is he having a trial? But I ask that you not hold that against the State because he pled not guilty." On appeal, the defendant, Bolton, argued that the prosecutor's comments constituted an impermissible remark on Bolton's exercise of his right to stand trial. *Id*. This Court

14

determined, however, that although the comments were improper, Bolton was not prejudiced by the comments and no reversible error occurred. *Id*. at (¶¶14-15). This Court found that "the jury was properly instructed it could not find Bolton guilty unless the State proved every element [of the charged offense] beyond a reasonable doubt," and determined that the improper comments by the prosecutor "did not negate this instruction." *Id*. at (¶15).

¶36. In reaching its decision, the *Bolton* court cited to its prior opinion in *Moore v. State*, 932 So. 2d 833, 839 (¶19) (Miss. Ct. App. 2005), where the prosecutor told the jury in closing argument: "Y'all didn't want to be here. That man put you here." *Bolton*, 113 So. 3d at 578 (¶14). The defendant, Moore, argued that "the comment implied he did not have a right to put on a defense." *Id*. The *Moore* court acknowledged that "there was no valid reason" for the prosecutor's statement, but found no reversible error because "the jury was well instructed as to Moore's theory of self-defense, and without more, we cannot find that the [prosecutor's] statements negated the effectiveness of the instructions given the jury." *Id*.

¶37. In the present case, the record reflects that the trial court instructed the jury that it could not find Owens guilty of deliberate design murder unless the State proved every element of the offense beyond a reasonable doubt. The trial court also granted Owens's heat-of-passion manslaughter instruction and his self-defense instruction that instructed the jury, in pertinent part, that "[i]f you find from the evidence that [Owens] acted in self-defense during the altercation with [Ruth] then you must find [Owens] not guilty." After our review, we find that Owens was not prejudiced by the prosecutor's comments, and no reversible error

occurred.  This issue lacks merit.

¶38.    **AFFIRMED.**

    **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**